1
2
3              UNITED STATES DISTRICT COURT
4                   DISTRICT OF NEVADA
5                         * * *
6    ROSA ESTER BRIZUELA, *et al.*,          Case No. 3:19-cv-00692-MMD-VPC
7                         Plaintiffs,         ORDER
8         v.
     CITY OF SPARKS, *et al.*,
9
                         Defendants.
10

11   **I.    SUMMARY**

12        On July 17, 2018, two Sparks Police Department officers shot and killed Rolando

13   Brizuela in the enclosed patio of his home. This action is brought by Plaintiffs Rosa

14   Brizuela, both as the administrator of Mr. Brizuela's estate and in her individual capacity

15   as his wife, and by Roland Brizuela and Morgan Brizuela, in their individual capacities as

16   his sons. Plaintiffs collectively bring 12 claims against Defendants City of Sparks and

17   Sparks Police Department officers Brian Sullivan and Eli Maile. Before the Court are three

18   motions: Defendants' motion for partial judgment on the pleadings (ECF No. 82),[1]

19   Plaintiffs' motion for partial summary judgment (ECF No. 87),[2] and Defendants' motion

20   for summary judgment (ECF No. 91).[3] As explained further below, the Court will deny

21   Defendants' motion for partial judgment on the pleadings (ECF No. 82), grant Plaintiffs'

22   motion for partial summary judgment (ECF No. 87), and grant in part and deny in part

23   Defendants' motion for summary judgment (ECF No. 91).

24

25        [1]Plaintiffs responded (ECF No. 85) and Defendants replied (ECF No. 98).

26        [2]Plaintiffs' initial motion for partial summary judgment (ECF No. 83) is superseded
     by the amended motion (ECF No. 87). Plaintiffs supplemented their amended motion
27   (ECF No. 97) with declarations from Rosa and Roland Brizuela. Defendants responded
     (ECF No. 99) to the amended motion and Plaintiffs replied (ECF No. 100).
28
          [3]Defendants filed their exhibits separately. (ECF No. 93.) Plaintiffs responded
     (ECF No. 102) and Defendants replied (ECF No. 107).

1  **II.  BACKGROUND**

2      Mr. Brizuela's wife and sons now assert claims on his behalf and in their individual

3  capacities. Relevant to the disposition of those claims are the events of the evening in

4  question, the Officers' training, and the City's policies, which the Court sets forth here.

5  The following facts are undisputed unless otherwise noted.

6      **A.    Sparks Police Department's Policies**

7      Sparks Police Department ("SPD") issues General Orders to document its policies

8  by which its officers are bound to comply. Two of those General Orders are relevant to

9  this litigation: General Order DM 7.1, which establishes guidelines for the Crisis

10  Intervention Team ("CIT"), and General Order DM 9.1, which governs SPD officers' use

11  of force. (ECF Nos. 102-21, 102-22.)

12      DM 7.1 provides that some SPD officers will be specially trained "to handle

13  incidents involving mentally ill persons and those in crisis with care and expertise,

14  ensuring that such persons receive appropriate responses based on their needs." (ECF

15  No. 102-21 at 2.) These officers, known as CIT members, are "on-duty, uniformed Patrol

16  Division Officers and Detectives, who have received specialized training and been

17  certified in crisis intervention." (*Id.*) DM 7.1 establishes guidelines and procedures for CIT

18  members. (*Id.*) CIT officers are trained to "[i]nteract with persons who are mentally ill or

19  in crisis . . . [d]e-escalate crisis events and mitigate potentially violent outcomes when

20  possible . . . [and] [u]tilize the resources and services available to those with mental

21  illness." (*Id.*) DM 7.1 largely addresses situations in which dispatch is aware of a situation

22  that would benefit from a CIT officer. (*Id.*) However, the policy applies in situations where

23  "[c]ommunications receives a call for service meeting criteria for dispatch of CIT officer"

24  and where "an officer goes to a call and determines that it meets the criteria to dispatch

25  a CIT officer." (*Id.*)

26      All SPD officers are governed by the same policy regarding use of deadly and non-

27  deadly force as set forth in DM 9.1. (ECF No. 102-22.) Per section 9.1.01:

28      The use of deadly or non-deadly force is restricted to the purposes of self
         protection, the protection of others, to compel compliance with a lawful

2

order, to prevent the escape of a dangerous offender, per Tennessee v. Garner, 471 US 1 (1985) or to take an offender into custody.

(*Id.* at 2.) Officers are required to "use de-escalation techniques and other alternatives to higher levels of force consistent with his or her training wherever possible and appropriate before resorting to force and to reduce the need for force." (*Id.* at 3.)

If an "officer involved shooting" occurs, the involved officer's supervisors will "respond in accordance with the Officer Involved Shooting Protocol." (*Id.* at 11.) As part of the required response "the Internal Affairs Lieutenant will complete an administrative review of the officer involved shooting" after the completion of any criminal investigation. (*Id.*) The internal affairs review "will include background information about the shooting, an overview of the investigation and an analysis of applicable policies." (*Id.*)

## B.   The Responding Officers' Training

Both Defendant Officers were CIT members. Sullivan was trained in crisis-intervention within the first two years of serving as an SPD officer. (ECF No. 93-7 at 4.) His training involved learning de-escalation techniques, including "using a calm voice," "showing respect for the . . . potential arrestee," and "trying techniques to reduce the anxiety of the arrestee." (ECF No. 93-4 at 7.)

Maile was also crisis-intervention trained and completed a two 40+ hour courses on crisis intervention, an eight-hour course on "Calming Aggressive and Emotionally Disturbed Individuals," and two hostage negotiation training courses. (ECF Nos. 93-22 at 3-7, 93-8 at 10.) Maile also states that prior to the incident on July 17, 2018, he had taken individuals for Legal 2000 holds—incidents in which police presence is requested to take a person for psychological evaluation—"probably over 50" times. (ECF No. 93-8 at 12.) Despite these official trainings and practical experience, Maile states that he was trained "very little" in recognizing the symptoms of mental illness. (*Id.* at 11.)

## C.   The Brizuela Residence

At the time of the incident, the Brizuelas lived at 1753 London Circle, Sparks, NV 89431 (the "Brizuela Residence" or the "home"). Mr. and Mrs. Brizuela had purchased the

3

1   home on April 15, 2013. (ECF No. 93-14 at 2-3.) The home was also known as Lot 14 of

2   Yorkshire Manor, a common-interest community. (*Id.* at 4.) Yorkshire Manor consists of

3   40 fourplexes comprising 160 individual lots that are arranged around three streets: York

4   Way, Manchester Way, and London Circle. (ECF No. 93-15 at 2.) Of its fourplex, Lot 14

5   was the front-right unit facing London Circle. (*Id.*) Interspersed between the fourplexes

6   are six defined common areas, lettered A through F. (*Id.* at 4.) Lot 14—the Brizuela

7   Residence—was situated within common area A. (*Id.* at 2.)

8          Per the official plat, the common areas, roads, and driveways are "subject to a

9   blanket easement for drainage and utilities installed for the benefit of this subdivision,"

10  and are designated as "recreational, intended for use by the home owners of Yorkshire

11  Manor for recreation and other related activities." (*Id.*) The common areas are not,

12  however, "for use by the general public, but are dedicated to the common use and

13  enjoyment of the home owners of Yorkshire Manor as fully provided by the Declaration of

14  Covenants, conditions, and restrictions applicable to Yorkshire Manor." (*Id.*) The

15  covenants, conditions, and restrictions ("CC&Rs") grant an easement to each owner,

16  stating, "Every owner shall have a right and easement of enjoyment in and to the Common

17  Area which shall be appurtenant to and shall pass with the title to every Lot." (ECF No.

18  93-18 at 3.



1        The portion of common area A that is directly in front of the Brizuela Residence

2   includes a grass lawn with a concrete walkway connecting the home to the sidewalk.

3   (ECF No. 87-12 at 2.) To the left of the home's front door is an enclosed patio. (*Id.*) When

4   the walkway reaches the edge of the patio, there is a step up that appears to be tiled with

5   slate. (*Id.*) Approximately three feet beyond the initial step, there is a second slate-tiled

6   step that leads to the front door of the home. (*Id.*) Perpendicular to and to the left of the

7   front door is a wooden gate leading into the patio. (*Id.*) The patio is enclosed by a

8   combination brick pony-wall and lattice fence. (*Id.*)

9        In their depositions, both Officers stated that they subjectively believed the

10   walkway and the porch were part of the curtilage of the Brizuela Residence. (ECF Nos.

11   93-4 at 25, 93-8 at 23.)

12        **D.     The Incident: July 17, 2018**

13        The events giving rise to most claims occurred within a one-hour window on the

14   evening of July 17, 2018, as relayed below.

15             **1.     The Initial Report**

16        At 8:40 p.m., Gabriella Guadron-Castillo reported a confrontation she had had with

17   a neighbor to SPD and requested police response. (ECF No. 93-1 at 6.) Officer Brian

18   Sullivan self-dispatched to meet with Guadron-Castillo at Sparks Middle School, as

19   Guadron-Castillo reported she did not feel comfortable going into her house while the

20   neighbor was watching her. (ECF Nos. 93-1 at 6, 93-2 at 1:25-5:38, 102-3 at 8.) When

21   Sullivan arrived at Sparks Middle School, night was falling and the streetlights were on.

22   (ECF No. 93-2 at 1:25-5:38.) Guadron-Castillo was waiting in her car with her young

23   daughter. (*Id.*) She told Sullivan that when she had arrived at her house, her neighbor

24   had been watching her in a way that scared her. (*Id.*) She further stated that she had seen

25   her neighbor push a teenager off his skateboard, take the skateboard, and throw it inside

26   his house. (*Id.* at 1:25-2:45.) She also told Sullivan that there had been an incident a few

27   months ago at that neighbor's house that required police response, and the police had

28   told her to stay inside because the neighbor had a gun. (*Id.* at 2:57-3:25.)

1    Sullivan asked if Guadron-Castillo wanted him to follow her home to make sure

2    she arrived safely, and she agreed. (*Id.* at 3:38-3:42.) Guadron-Castillo asked if she

3    should be concerned about the neighbor, and Sullivan said, "if all he's doing is staring at

4    you, I would just ignore him." (*Id.* at 3:42-3:53.) Guadron-Castillo explained she felt that

5    the incident with the skateboarder was "just weird," that the skateboarder was not "even

6    a man" but "like a nineteen-, twenty-year-old." (*Id.* at 4:37-4:39.)

7    Sullivan returned to his police car and informed dispatch that he was going to

8    accompany Guadron-Castillo to her home so she could get inside without confrontation.

9    (*Id.* at 5:05-5:07.) Dispatch informed him there had been a second call that described an

10   incident involving a skateboarder, who was currently home alone. (*Id.* at 5:40-5:53.)

11   Dispatch informed Sullivan that the suspect had "a history of 10-32," which Sullivan

12   understood to mean there had been a prior incident with a gun. (ECF Nos. 93-2 at 5:40-

13   5:53, 93-4 at 12.) Dispatch further noted the reporting party said the suspect "then pulled

14   a gun out [and] brandished it" and "a female yelled at him run and go home." (*Id.* at 6:03-

15   6:22.) Sullivan later testified that when he arrived at the Brizuela Residence, he didn't

16   have information that Mr. Brizuela possessed a firearm and was surprised when Mr.

17   Brizuela took out a gun. (ECF No. 93-4 at 17.)

18                    **2.    Sullivan's First Encounter with Mr. Brizuela**

19   It took Sullivan under two minutes to drive from Sparks Middle School to London

20   Circle. (ECF No. 93-2 at 6:02-7:18.) When Sullivan arrived on London Circle, he exited

21   his police car. (*Id.* at 7:18.) The first person he encountered after exiting his police vehicle

22   was "a Hispanic male in his forties wearing a white collared shirt" with the sleeves rolled

23   up to the elbows, standing on the public sidewalk next to a white car across the street.

24   (ECF Nos. 93-2 at 7:28-7:35, 102-3 at 11.) Sullivan did not know the man at that time, but

25   he would later be identified as Rolando Brizuela. Mr. Brizuela had been standing next to

26   the open door of the white car's back seat, which he then closed. (ECF No. 93-2 at 7:33-

27   7:38.)

28   ///

6

1       Sullivan greeted Mr. Brizuela, saying "Hello . . . good, how are you," then "You

2   getting along with everybody today?" (*Id.* at 7:33-7:38.) Mr. Brizuela responded, "Are you

3   gonna shoot me?" (*Id.* at 7:40-7:42.) Sullivan said no, that he was just saying hello, and

4   that he was going to speak with someone else. (*Id.* at 7:42-7:58.)  Mr. Brizuela replied,

5   "go ahead" and said "this is my house . . . I got a right to be over here" and gestured at

6   1753 London Circle. (*Id.* at 7:42-8:02.) Sullivan then asked Mr. Brizuela, "did you get in a

7   fight with a guy on a skateboard today?" (*Id.* at 8:02-8:05.) Mr. Brizuela responded "Nope

8   . . . how did you know that?" (*Id.* at 8:05-8:07.) Sullivan said that someone had had a fight

9   with a guy on a skateboard, and Mr. Brizuela replied, "Really? Well then go arrest him

10  because I don't know nobody." (*Id.* at 8:13-8:17.) Mr. Brizuela repeated that he had a right

11  to be there at his house, and Sullivan asked again if he knew anything about the fight with

12  the skateboarder earlier. (*Id.* at 8:18-8:25.) Mr. Brizuela denied knowing anything about

13  the incident. (*Id.*)

14      Sullivan then ended the encounter by telling Mr. Brizuela to "have a good night,"

15  crossed the street toward the Brizuela Residence, and continued walking down the street.

16  (*Id.* at 8:25-8:26.) Mr. Brizuela asked Sullivan where he was going, and Sullivan said he

17  was going to talk to someone else. (*Id.* at 8:27-8:29.)

18          **3.**    **Sullivan's Encounters with Mr. Brizuela's Neighbors**

19      Sullivan began to walk away from Mr. Brizuela down London Circle. (ECF No. 93-

20  2 at 8:26-8:59.) At the house next to the Brizuela Residence, Sullivan encountered a

21  woman (later identified as Shelly Register) sitting on the porch. (*Id.*) Register's porch light

22  was on, and her front door was open while she sat with her dogs. (*Id.* at 8:40.) She greeted

23  Sullivan and he walked on. (*Id.* at 8:42-8:54.) Register later affirmed that she knew Mr.

24  Brizuela "had some mental health issues and that the police had been called to his home

25  because he had allegedly threatened his wife with a gun," but Sullivan did not interview

26  her that night. (ECF No. 93-5 at 5.)

27      When Sullivan saw that Guadron-Castillo had already pulled into her garage, he

28  turned around and walked toward the skateboarder's address, passing Mr. Brizuela for a

1   second time less than one minute after their first conversation. (ECF No. 93-2 at 9:10-

2   9:41.) Mr. Brizuela was leaning against the white car. (*Id.*) Sullivan said, "Nice night, isn't

3   it?" and Mr. Brizuela responded affirmatively. (*Id.*)

4          After continuing a short way down the street, Sullivan approached a driveway

5   between two fourplexes. (*Id.* at 10:23-10:26.) It was dark and Sullivan shone his flashlight

6   at several units, appearing to look for the skateboarder's address. (*Id.*) At the entrance to

7   the driveway, Sullivan encountered Zena Aguilar and his wife. (*Id.* at 10:26-10:28.)

8   Sullivan asked them where he could find the skateboarder's address. (*Id.*) After Aguilar

9   pointed further down the driveway, Sullivan asked if he had witnessed a fight between

10  neighbors that day. (*Id.* at 10:35-10:37.) Aguilar gestured toward Mr. Brizuela and said,

11  "probably it was that one right there" adding that Mr. Brizuela had been "having problems

12  with everybody." (*Id.* at 10:35-10:41.) Sullivan said that was "kinda what I was thinking"

13  based on how confrontational Mr. Brizuela had been. (*Id.* at 10:41-10:44.) Aguilar said

14  that Mr. Brizuela had chased his truck and explained that he is the "maintenance guy" for

15  the subdivision. (*Id.* at 10:50-10:57.) Aguilar informed Sullivan that Mr. Brizuela's wife had

16  recently said Mr. Brizuela had been "having some problems," including that he was talking

17  about "killing people," had been "talking to himself," and that he was "hearing voices." (*Id.*

18  at 10:59-11:12.) Mrs. Brizuela had warned Aguilar to "just be careful with him if he gets

19  close to you." (*Id.* at 11:12-11:20.)

20         Sullivan then continued on to the skateboarder's home at the end of the driveway.

21  (*Id.* at 11:20-12:21.) Sullivan informed dispatch that he was "pretty sure" the suspect

22  would be sitting outside at 1751 London Circle, but that he would "make 10-17 first." (*Id.*

23  at 11:55-11:57.) As Sullivan approached the unit, he walked onto the patio and observed

24  a person inside the home through a sliding glass door. (*Id.* at 12:05-12:10.) He then

25  knocked on the door of the unit and identified himself as Sparks Police. (*Id.* at 12:10-18.)

26  A young man answered the door and confirmed that he had called to report the fight. (*Id.*

27  at 12:18-12:20.) The skateboarder is herein referred to as N.A. because he was a minor

28  at the time of the incident.

1   N.A. told Sullivan that he had been riding his skateboard down the sidewalk when

2   a man, for no reason, "pushes me off my skateboard, and punched me in the face." (*Id.*

3   at 12:20-12:43.) The man then took his skateboard and ran inside his house. (*Id.* at 12:43-

4   12:52.) N.A. said that he had wanted to follow the man into his home to get his skateboard,

5   but the man's wife told him to run because "he's gonna do something" to N.A. and he has

6   "weapons and stuff." (*Id.* at 12:53-13:03.) N.A. told Sullivan he decided to call the police

7   because he wanted his skateboard back. (*Id.* at 13:03-13:08.)

8   Sullivan asked N.A. where the man had punched him, and N.A. indicated his

9   forehead. (*Id.* at 13:08-13:13.) Sullivan then shone a light on N.A.'s face and observed

10   aloud there was "a little knot" on N.A.'s forehead. (*Id.* at 13:12-13:19.) Sullivan asked how

11   old N.A. was, and he told Sullivan he was 16. (*Id.* at 13:19-13:23.) Sullivan asked if N.A.

12   wanted to press charges against the man, and N.A. said he did. (*Id.* at 13:23-13:25.) At

13   no point did Sullivan speak with N.A.'s parents or ask when they would return. As he was

14   walking away, Sullivan asked N.A. what color shirt the man was wearing. (*Id.* at 13:25-

15   13:37.) N.A. said he was not sure because it happened only over a couple seconds, but

16   he thought the man was wearing a white tank top. (*Id.* at 13:37-13:39.)

17   ### 4.   Maile's Arrival

18   After Sullivan concluded his interview with N.A., Officer Eli Maile arrived on scene.

19   (ECF No. 93-2 at 13:52.) The Officers met up at the end of the driveway near the Aguilars'

20   house. (*Id.* at 14:00-14:04.) Sullivan observed that Mr. Brizuela seemed to have gone

21   inside, but pointed out the car that Mr. Brizuela had been leaning on to Maile. (*Id.* at 14:03-

22   14:04.) Sullivan told Maile that when he had gotten out of his car, Mr. Brizuela had been

23   "eye-fucking" him. (*Id.* at 14:10-14:15.) Sullivan further relayed that after greeting Mr.

24   Brizuela, the first thing Mr. Brizuela said was "are you gonna shoot me?" (*Id.* at 14:18-

25   14:21.) Sullivan described Mr. Brizuela as being "super weird," recounting Mr. Brizuela's

26   comments in an angry or agitated tone of voice. (*Id.* at 14:25-14:39.) Sullivan shared that

27   he was pretty sure "this is the guy" and recounted the incident with the 16-year-old

28   skateboarder to Maile. (*Id.* at 14:39-14:51.)

1      As Sullivan was began to explain to Maile why N.A. decided to leave rather than

2  attempt to reclaim his skateboard, Aguilar interrupted the Officers. (*Id.* at 14:55-15:05.)

3  Aguilar approached and told the Officers that when he and his wife had passed Mr.

4  Brizuela earlier that evening, Aguilar's wife said she saw "something" in Mr. Brizuela's

5  hand, and that she wasn't sure if he had put the item in the car. (*Id.* at 15:05-15:42.) The

6  Officers thanked Aguilar, and then began walking toward the Brizuela Residence. (*Id.* at

7  15:45-15:49.) Sullivan did not relay to Maile any of the Aguilars' prior comments, including

8  that Mrs. Brizuela had said Mr. Brizuela had been hearing voices. Nor did Sullivan tell

9  Maile that N.A. decided against trying to reclaim his skateboard personally because Mrs.

10  Brizuela had said Mr. Brizuela had weapons.

11      As they were walking toward the Brizuela Residence, Sullivan said, "we're just

12  going to 95 him if we can make contact with him really fast until we can figure everything

13  else out." (*Id.*) Sullivan later testified that he understood to "95" someone is "just to say

14  put handcuffs on them." (ECF No. 93-4 at 32.) Sullivan explained that he intended simply

15  to detain Mr. Brizuela, and understood the "plan" was not to arrest Mr. Brizuela or take

16  him into custody, but simply to detain him and continue investigating. (*Id.*) Maile, however,

17  understood 10-95 as meaning to arrest someone, clarifying in his deposition that "10-95

18  is a 10 code for arrest." (ECF No. 93-8 at 14.)

19      The Officers did not discuss any plan beyond "95"-ing Mr. Brizuela. The Officers

20  crossed the street and Sullivan confirmed that Maile had not seen Mr. Brizuela "out there"

21  when he arrived on London Circle. (ECF No. 93-2 at 15:49-15:58.) As they approached

22  the white car Sullivan had seen Mr. Brizuela leaning against, Mr. Brizuela was not visible

23  on either Officer's body cam. When the Officers reached the white car, they asked

24  dispatch to run the registration. (*Id.* at 16:15-17:21.) Sullivan informed Maile that the

25  suspect was a Hispanic male in his forties wearing a collared white shirt. (*Id.* at 16:30-

26  34.) Sullivan shone his flashlight into the car, where no weapons were visible. (*Id.* at

27  16:34-16:51.) Dispatch responded that the vehicle Mr. Brizuela had been leaning against

28  was registered to 1753 London Circle, the house next to the one it was parked in front of.

1   (*Id.* at 17:20-17:24.) Sullivan did not ask any further questions about the location and

2   confirmed to dispatch that "that's where we'll be." (*Id.*at 17:23-17:24.)

### 5.   The Fatal Encounter

4          When the Officers arrived back at 1753 London Circle, Register was still sitting on

5   her porch next door with her dogs. (ECF No. 93-5 at 4.) Stepping away from the white car

6   and onto the sidewalk, the Officers turned their flashlights toward the Brizuela Residence.

7   (ECF No. 93-2 at 17:36.) Mr. Brizuela was standing inside his enclosed patio area with

8   the gate closed, the top of his head visible over the gate, facing the Officers. (*Id.*) The

9   Officers began to walk up the walkway. (*Id.* at 17:35.) Immediately, Mr. Brizuela said,

10  "You can no coming in here without a judge order." (*Id.* at 17:35-17:40.) Sullivan

11  responded, "Ok cool, can you come out and talk to me?" (*Id.* at 17:40-17:42.) Mr. Brizuela

12  opened the gate, put one foot out onto the porch and responded, "No I don't have to, I

13  have nothing to talk to you . . . you cannot coming in here without a judge order." (*Id.* at

14  17:42-17:47.) Mr. Brizuela then turned and stepped back into the enclosed patio and

15  closed the gate, telling the Officers to "turn around and leave" as he went. (*Id.* at 17:47-

16  17:51.)

17         At this point in time, Sullivan believed he had the legal authority to be on the porch,

18  to break into the enclosed patio, and to break through the front door into the interior of

19  the home. (ECF No. 93-4 at 27-28.) As he understood the situation, he would have been

20  justified to follow Mr. Brizuela into the patio under the ground of "fresh pursuit." (*Id.*) He

21  did not actually consider breaking through the gate or through the front door of the home

22  at that time. (*Id.*) Sullivan further distinguished between where he stood "on the front

23  porch" from the interior of the home. (*Id.* at 31.) Maile testified that he did not believe they

24  had the authority to break into the house because no one was in imminent danger and

25  there was no evidence about to be destroyed. (ECF No. 93-8 at 21.) However, Maile did

26  believe that Mr. Brizuela was fleeing from the porch to the enclosed patio. (*Id.*)

27         Sullivan ignored Mr. Brizuela's directive that they leave and instead stepped onto

28  the porch directly outside the closed patio gate, asking Mr. Brizuela, "What's your name?"

11

1   (ECF No. 93-2 at 17:50-17:51.) Mr. Brizuela responded, "If, if, if you are going to arrest

2   me . . . you, you need to . . . okay, you're breaking, you're breaking your own law." (*Id.* at

3   17:52-17:57.) Sullivan replied, "No I'm not." (*Id.* at 17:57.) Mr. Brizuela raised his voice

4   and said, "Yes you are, this is my property." (*Id.* at 17:57-17:59.) Sullivan unsuccessfully

5   tried to interrupt Mr. Brizuela, and then Maile cut in and said, "Sir, listen . . ." while Mr.

6   Brizuela continued to speak. (*Id.* at 17:59-18:07.) Maile interrupted, "No, no, no, you

7   listen, we came over here to talk to you about something that happened," and asked Mr.

8   Brizuela if something had happened between him "and a kid" that day. (*Id.* at 17:59-

9   18:34.) Mr. Brizuela responded, "Okay, how do you know that? How do you come in and

10  blame me for something?" (*Id.*) Maile replied that they had not said they blamed Mr.

11  Brizuela, but were just asking him about it. (*Id.*) Mr. Brizuela responded, "You know the

12  law? Okay, you need to, in order to come into my property, you need . . ." (*Id.*at 17:51-

13  18:34.) Maile cut in again, saying, "Listen, we are asking you questions about it because

14  somebody said you were involved." (*Id.*)

15      While Maile was questioning Mr. Brizuela, Sullivan knocked eight times on the

16  metal screen on the Brizuelas' front door. (*Id.* at 18:31.) Mr. Brizuela told Sullivan, "Don't

17  knock the door," to which Sullivan replied, "Oh I'm going to knock it." (*Id.* at 18:34-18:36.)

18  Mr. Brizuela repeated, "don't knock the door" twice more, and Sullivan again responded,

19  "Oh, I'm going to," and announced that they were Sparks Police. (*Id.* at 18:37-18:40.) Mr.

20  Brizuela told his wife not to open the door, but she opened the front door while leaving

21  the metal screen closed. (*Id.* at 18:40-18:44.) Sullivan greeted her and asked her to open

22  the door so that he could speak with her, stating, "It's probably for your own safety." (*Id.*

23  at 18:44-18:52.)

24      Maile then said loudly, "Hey, gun." (*Id.* at 18:53.) Register, who was still sitting on

25  her porch, "immediately grabbed [her] two dogs and laid flat." (ECF No. 93-5 at 5.) Neither

26  of the Officers addressed Register in any way or told her to go into her home. Sullivan

27  turned back to the gate and yelled "gun!" and began yelling at Mr. Brizuela to "put it down!"

28  (ECF No. 93-2 at 18:54-18:57.) Sullivan later testified that at this point he was standing

1    on the highest step nearest to the front door, and that from that vantage point he could

2    clearly see Mr. Brizuela. (ECF No. 93-4 at 35.) Sullivan also testified that he did actually

3    see Mr. Brizuela holding a gun and that Mr. Brizuela was facing the Officers at that time.

4    (ECF No. 93-4 at 36.) Both Officers testified that when they first observed Mr. Brizuela

5    with the gun, he was holding it to his side and slightly away from his body. (ECF Nos. 93-

6    4 at 36, 93-8 at 28.) At that time, Sullivan did not feel that there was an immediate threat,

7    even though Mr. Brizuela had picked up the gun. (ECF No. 93-4 at 37.) Sullivan described

8    experiencing tunnel vision at that moment and stated he could not hear anything Mr.

9    Brizuela said. (*Id.*) He did not consider retreating to a position of cover. (*Id.* at 38.)

10       The Officers both repeatedly yelled at Mr. Brizuela to "put it down" and "put the

11   gun down." (ECF No. 93-2 at 18:57-19:09.) Mr. Brizuela said from inside the enclosed

12   patio, "You are break—you are—you are a thief." (*Id.* at 19:09-19:10.) Sullivan continued

13   to yell at Mr. Brizuela to put the gun down and Maile told Mr. Brizuela, "We're not a thief.

14   Sir, put the gun down." (*Id.* at 19:10-19:15.) Mr. Brizuela said, "Go—go ahead, shoot." (*Id.*

15   at 19:16.) The Officers continued to order Mr. Brizuela to put his gun down, and then

16   opened fire. (*Id.* at 19:16-19:28.) The Officers fired on Mr. Brizuela for four seconds. (*Id.*

17   at 19:28-19:31.)

18       Maile testified that he could clearly see Mr. Brizuela when he began to shoot. (ECF

19   No. 93-8 at 10.) Sullivan claims that at some point before he began to shoot, he saw Mr.

20   Brizuela rack the gun. (ECF No. 93-4 at 38.) Maile claims to have heard Mr. Brizuela rack

21   his gun. (ECF No. 93-8 at 29.) Sullivan testified that at some point after, Mr. Brizuela

22   raised the gun at the Officers, which prompted the Officers to shoot him. (ECF No. 93-4

23   at 38.) Maile claims that he saw Mr. Brizuela start to raise the gun, but that it was not

24   even close to a 90-degree angle. (ECF Nos. 93-8 at 29, 102-32.) Sullivan did not see Mr.

25   Brizuela's body turned away from the Officers at any point. (ECF No. 93-4 at 38.) Maile,

26   however, said that at first, Mr. Brizuela's right side was facing the Officers while Mr.

27   Brizuela held the gun in his right hand. (ECF No. 93-8 at 27.) Maile testified that he later

28   saw Mr. Brizuela turn to face the Officers. (*Id.* at 28.)

Sullivan believed each shot he fired was necessary. (ECF No. 93-4 at 39.) Sullivan did not consider using a taser, explaining that he didn't think the taser could reach Mr. Brizuela because the distance between where he stood on the porch and where Mr. Brizuela stood on the patio to be "at least 25 feet." (*Id.*) Maile estimated the distance to be "10 feet at the most." (ECF No. 93-8 at 28.)

In his deposition, Sullivan stated that he believed under the totality of the circumstances there was not time to obtain a warrant. (ECF No. 93-4 at 31.) He did not consider calling in more officers to secure the area so that they could apply for a warrant. (*Id.* at 32.) He did not have information that Mr. Brizuela was going to leave his house to harm anyone, but believed "there was a propensity" for that to happen. (*Id.*)

### 6. Post-Shooting Response

After the Officers stopped firing, Sullivan told dispatch, "one down" and "shots fired." (ECF No. 93-2 at 19:31-19:52.) Sullivan told Maile that he had a "gun on him" and asked Maile to "make contact with the girl inside." (*Id.* at 20:01-20:05.) Maile asked Mrs. Brizuela to come out of the home. (*Id.* at 20:14-20:17.) Mrs. Brizuela came to the door and repeatedly asked what had happened while crying and trying to catch her breath. (*Id.* at 20:17-21:15.) Maile escorted her inside, and she can be heard sobbing and screaming from the porch. (*Id.* at 21:15-24:00.) Mrs. Brizuela begged Maile if they could take Mr. Brizuela to the hospital, and Maile explained medics were coming. (*Id.* at 24:00-24:04.)

Officer Peter Loeschner was dispatched to the Brizuela Residence to respond to an officer-involved shooting. (ECF No. 93-7 at 3.) When additional officers arrived on the scene, approximately five minutes after the Officers shot Mr. Brizuela, Sullivan confirmed Mr. Brizuela "is facedown, he does have a gun, I'm not sure what happened to it." (ECF No. 93-2 at 24:26-24:28.) Loeschner entered the patio and observed Mr. Brizuela "motionless" and "lying face down upon the floor." (ECF No. 93-7 at 4.) Mr. Brizuela's left arm and hand were visible and not holding a weapon. (*Id.*) Loeschner could not see Mr. Brizuela's right arm or hand. (*Id.*) Mr. Brizuela was bleeding and Loeschner determined he may need "immediate medical attention." (*Id.*) Loeschner then pulled Mr. Brizuela's

1   right arm out and away from his body to handcuff him. (*Id.*) As he did so, a black handgun

2   came out from underneath Mr. Brizuela's torso. (*Id.*) Another officer began to administer

3   first aid. (*Id.*)

4   **E.    The Autopsy**

5          Dr. Katherine Callahan of the Washoe County Medical Examiner performed an

6   autopsy on Mr. Brizuela's body on July 18, 2018, the day after he was killed. (ECF No.

7   102-13.) Dr. Callahan recorded eleven bullet wounds, all fired from indeterminate range.

8   (*Id.* at 3-5.) Gunshot wounds I and II entered from the back of Mr. Brizuela's head on the

9   left side. (*Id.* at 3, 8-10.) Gunshot wound III entered from Mr. Brizuela's left lower chest.

10  (*Id.* at 3, 10.) Gunshot wounds IV, V, and VI entered from Mr. Brizuela's left upper and

11  lower back. (*Id.* at 3-4, 11-12.) Gunshot wound VII entered from Mr. Brizuela's back right

12  thigh. (*Id.* at 4, 12-13.) Gunshot would VIII entered from the back of Mr. Brizuela's back

13  left thigh. (*Id.* at 4, 13.) Gunshot wounds IX, X, and XI entered Mr. Brizuela's left arm. (*Id.*

14  at 4-5, 13-15.) Dr. Callahan ruled the cause of death was multiple gunshot wounds and

15  noted that there was no alcohol or commonly abused drugs detected in Mr. Brizuela's

16  blood. (*Id.* at 5.) Dr. Callahan further found no evidence of soot or gunpowder on Mr.

17  Brizuela's hands. (*Id.* at 7.)

18  **F.    Investigation and Follow-Up**

19         Detective P. Blas of the Reno Police Department ("RPD") investigated the incident

20  as part of a criminal investigation. (ECF Nos. 102-3, 102-7, 102-14.) Sullivan was

21  interviewed at 3:25 a.m. the morning following the shooting—approximately six hours

22  after the incident—as part of the RPD's criminal investigation. (ECF No. 102-3 at 2.)

23         Sullivan told Detective Blas that he self-dispatched to respond to Guadron-

24  Castillo's call. (*Id.* at 8.) Once there, Guadron-Castillo told him that there had been "tons

25  of problems" with Mr. Brizuela in the neighborhood, that "he's been known to have guns,"

26  and "multiple times the police have been there and had to point their guns at him." (*Id.* at

27  9.) Sullivan recalled Mr. Brizuela's tone as being "super aggressive" and "loud and

28  authoritative" when Sullivan first encountered him. (*Id.* at 12.) He noted it was "super

1   weird" and "not a normal encounter I would have with somebody." (*Id.*) Sullivan recounted

2   his discussion with Maile as stating that Mr. Brizuela is "going into handcuffs" "as soon as

3   we make contact" "right away for safety." (*Id.* at 17.) He states that when the Officers

4   made contact with Mr. Brizuela, Maile took over talking with Mr. Brizuela because he's

5   "really good at talking to people that are going through, um, issues." (*Id.* at 19.) Sullivan

6   relayed that he knocked on the door because "I need to find a way to get into that house

7   so I can talk to him so that he doesn't just disappear and I can't do anything about this."

8   (*Id.* at 20.) Once Mr. Brizuela picked up his weapon, Sullivan stated he started

9   "screaming" at Mr. Brizuela "just at the top of my lungs just yelling." (*Id.* at 22.) Sullivan

10  said that once they started firing, Mr. Brizuela "turned almost a 180 and started to fall"

11  and that as soon as he hit the ground Sullivan stopped firing. (*Id.* at 24.)

12          Blas also interviewed Maile. (ECF No. 102-7.) When Maile was dispatched to cover

13  Sullivan, he recalled noticing the report included "brandishing." (*Id.* at 8.) Maile relayed

14  that Sullivan's "ultimate goal was to arrest [Mr. Brizuela]," but at the very least to "detain

15  him so we can talk to him." (*Id.* at 22.) When they approached, Maile recounted that Mr.

16  Brizuela seemed "irrational . . . agitated, just angry." (*Id.* at 23.) Maile described watching

17  Mr. Brizuela pick up the gun and said he saw Mr. Brizuela rack it. (*Id.* at 13.) From his

18  stance on the porch, he could see over the gate but could only see the upper half of Mr.

19  Brizuela's body. (*Id.* at 30.) Maile further noted that the lighting conditions were "very poor"

20  but he did have his flashlight out. (*Id.* at 29.)

21          The Washoe County District Attorney's ("DA") office concluded that the Officers'

22  actions "were warranted under Nevada law" and closed the criminal case. (ECF No. 102-

23  30 at 40.) The DA determined the shooting was a justifiable homicide under Nevada law

24  because the Officers "reasonably believed that they were in imminent danger of great

25  bodily harm or death" and that "Register was also in imminent danger of death or great

26  bodily injury . . . it was absolutely necessary for [the] Officers . . . to use deadly force

27  against Brizuela in order to save their own lives, the lives of each other, and potentially

28  the lives of citizens in the area." (*Id.* at 40.)

1    Neither Sullivan nor Maile were retrained or disciplined for the shooting. (ECF No.

2    102-25 at 3.) There was no internal affairs investigation. (*Id.*) Indeed, Peter Krall, the Chief

3    of the Sparks Police Department in July 2018, testified in 2021 in another case that he

4    was unaware of a single Sparks Police Department officer-involved shooting that resulted

5    in discipline. (ECF No. 102-31 at 4.)

6    **G.    Mr. Brizuela's Mental Health History**

7    Eight months before the night he was killed, on November 15, 2017, SPD placed

8    Mr. Brizuela under a Legal 2000 hold and took him to the hospital for psychiatric

9    evaluation. (ECF Nos. 93-25, 102-14 at 7-10.) The report that resulted in the hold stated

10   that Mr. Brizuela had been talking about "'monsters' in his house." (ECF No. 93-25 at 2.)

11   In the early hours of the morning on November 15, Mr. Brizuela had "grabbed his gun and

12   told his wife there was a monster in the house," resulting in his wife leaving the house in

13   fear for her safety. (*Id.*) Mr. Brizuela was ultimately called out of the house by SPD's

14   armored vehicle intercom. (*Id.*)

15   Emergency medical services then took Mr. Brizuela to Renown Regional Medical

16   Center's emergency department ("Renown") for a psychiatric evaluation. (ECF No. 102-

17   14 at 7.) Upon his initial examination at Renown, Mr. Brizuela stated he was unsure why

18   he was there. (*Id.*) He denied being concerned with seeing monsters, confirmed having a

19   gun at home, and refused to answer whether he intended to use the gun. (*Id.*) He refused

20   to answer whether he had either homicidal or suicidal ideations. (*Id.*) Renown ran a urine

21   screen, which came back negative for all tested drugs, and a breathalyzer, which also

22   was negative. (*Id.* at 9.) The next day, Mr. Brizuela denied being concerned with seeing

23   monsters or having a gun. (*Id.* at 10.) The doctor noted "he doesn't even know how he

24   ended up getting here." (*Id.*)

25   Sullivan denies being aware of this history when he encountered Mr. Brizuela on

26   July 17, 2018. (ECF No. 93-4 at 12.) Dispatch did not inform Sullivan of Mr. Brizuela's

27   prior Legal 2000 hold. (*Id.*) Sullivan states that dispatch probably did not do a "history

28   search" on the location, because dispatch "typically [does not] do that unless we ask."

17

1  (*Id.*) Maile states he had not formed any opinion or belief that Mr. Brizuela was suffering

2  from a mental disorder or mental illness when he joined Sullivan on the scene. (ECF No.

3  93-8 at 12.) Maile denies ever getting any information from Sullivan about Mr. Brizuela's

4  mental state, though Sullivan had told him that Mr. Brizuela was "acting super weird." (*Id.*

5  at 17.)

6         **H.   This Action**

7         In sum, Plaintiffs' Fourth Amended Complaint ("FAC") asserts 12 claims: (1)

8  unreasonable search and seizure; (2) excessive force; (3) substantive due process; (4)

9  deprivation of familial relations and the right of association; (5) interference with the right

10  to bear arms; (6) false arrest and false imprisonment; (7) battery; (8) negligence; (9)

11  disability discrimination under the Americans with Disabilities Act ("ADA"); (10) wrongful

12  death; (11) municipal liability for unconstitutional custom, policy, or practice (asserted as

13  the administrator on behalf of Mr. Brizuela); and (12) municipal liability for unconstitutional

14  custom, policy, or practice (asserted by the family on their own behalf). (ECF No. 80.)

15  Mrs. Brizuela asserts Claims 1-3 and 5-11 as the administrator of Mr. Brizuela's estate

16  on his behalf. Mrs. Brizuela, Roland Brizuela, and Morgan Brizuela assert Claims 4 and

17  12 in their own individual capacity.

18  **III.   LEGAL STANDARDS**

19        **A.  Judgment on the Pleadings**

20         Granting judgment on the pleadings is appropriate when, "taking all allegations in

21  the pleadings as true, the moving party is entitled to judgment as a matter of law." *Gregg*

22  *v. Haw., Dep't of Pub. Safety*, 870 F.3d 883, 887 (9th Cir. 2017). A motion for judgment

23  on the pleadings under Federal Rule of Civil Procedure 12(c) uses the same standard as

24  a motion to dismiss for failure to state a claim upon which relief can be granted under

25  Rule 12(b)(6). *See id.* Either motion may only be granted when it is clear to the Court that

26  "no relief could be granted under any set of facts that could be proven consistent with the

27  allegations." *McGlinchy v. Shull Chem. Co.*, 845 F.2d 802 (9th Cir. 1988) (citations

28  omitted). Dismissal under Rule 12(b)(6) may be based on either the lack of a cognizable

1   legal theory or absence of sufficient facts alleged under a cognizable legal theory.

2   *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

3       A plaintiff's complaint must allege facts to state a claim for relief that is plausible

4   on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677, (2009). A claim has "facial

5   plausibility" when the party seeking relief "pleads factual content that allows the court to

6   draw the reasonable inference that the defendant is liable for the misconduct alleged."

7   *Id.* Although the Court must accept as true the well-pled facts in a complaint, conclusory

8   allegations of law and unwarranted inferences will not defeat an otherwise proper [Rule

9   12(b)(6)] motion. *Vasquez v. L.A. County*, 487 F.3d 1246, 1249 (9th Cir. 2007); *Sprewell*

10  *v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "[A] plaintiff's obligation to

11  provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and

12  conclusions, and a formulaic recitation of the elements of a cause of action will not do.

13  Factual allegations must be enough to raise a right to relief above the speculative level."

14  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and footnote omitted).

15  **B. Summary Judgment**

16      "The purpose of summary judgment is to avoid unnecessary trials when there is

17  no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,

18  18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). Summary judgment is appropriate

19  when the pleadings, the discovery and disclosure materials on file, and any affidavits

20  "show there is no genuine issue as to any material fact and that the movant is entitled to

21  judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue

22  is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder

23  could find for the nonmoving party and a dispute is "material" if it could affect the outcome

24  of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-

25  49 (1986). Where reasonable minds could differ on the material facts at issue, however,

26  summary judgment is not appropriate. *See id.* at 250-51. "The amount of evidence

27  necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to

28  resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718

1   F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253,

2   288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and

3   draws all inferences in the light most favorable to the nonmoving party. *See Kaiser*

4   *Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986) (citation

5   omitted).

6        The moving party bears the burden of showing that there are no genuine issues of

7   material fact. *See Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once

8   the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting

9   the motion to "set forth specific facts showing that there is a genuine issue for trial."

10  *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings

11  but must produce specific evidence, through affidavits or admissible discovery material,

12  to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir.

13  1991), and "must do more than simply show that there is some metaphysical doubt as to

14  the material facts." *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting

15  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere

16  existence of a scintilla of evidence in support of the plaintiff's position will be insufficient[.]"

17  *Anderson*, 477 U.S. at 252.

18  **IV.   DISCUSSION**

19        Three motions are before the Court. First is Defendants' motion for partial

20  judgment on the pleadings (ECF No. 82), addressing only the Second Amendment claim

21  (Claim 5) and the ADA claim (Claim 9). Second is Plaintiffs' motion for partial summary

22  judgment (ECF No. 87), addressing only the Fourth Amendment unreasonable search

23  and seizure claim (Claim 1). Third is Defendants' motion for summary judgment (ECF No.

24  91), addressing all 12 of Plaintiffs' claims.

25        The Court first examines Defendants' motion for partial judgment on the pleadings

26  and concludes the motion will be denied because Defendants have not shown they are

27  entitled to judgment as a matter of law. Next, the Court considers the cross-motions for

28  summary judgment on the unreasonable search and seizure question, concluding that

1  Plaintiffs are entitled to summary judgment that both an unreasonable search and an

2  unreasonable seizure occurred, and that Defendants are not entitled to qualified immunity

3  for those violations. Finally, the Court will address Defendants' summary judgment motion

4  on the remaining claims.

### A.    Defendants' Motion for Partial Judgment on the Pleadings

6  Defendants argue the Second Amendment and ADA claims fail as a matter of law,

7  and therefore Defendants are entitled to judgment on the pleadings. (ECF No. 82.) First,

8  Defendants assert that Plaintiffs may not recover damages for a violation of the Second

9  Amendment under 42 U.S.C. § 1983. Second, Defendants claim that Plaintiffs' ADA claim

10  is time-barred. Because both arguments are unpersuasive, the Court will deny

11  Defendants' motion for partial judgment on the pleadings.

### 1.    § 1983 Damages for Second Amendment Violations (Claim 5)

13  Because Defendants fail to show that monetary damages are unavailable as a

14  matter of law for a Second Amendment violation asserted under § 1983, the Court will

15  deny judgment on the pleadings as to the Second Amendment claim. Defendants' only

16  cited authorities in support of their argument that monetary damages are unavailable for

17  Second Amendment violations are inapposite. The cited cases involve challenges to pre-

18  enforcement state law statutes where courts found compensatory damages were

19  insufficient to remedy the violation and therefore injunctive relief was warranted because

20  the harm is irreparable. (ECF No. 82 at 3.) *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d

21  684, 699 (7th Cir. 2011) (analogizing Second Amendment violations to First Amendment

22  violations because the Second Amendment "protects similarly intangible interests" and

23  therefore constitutes irreparable harm). First, a finding that compensatory damages may

24  be insufficient to remedy a harm does not necessarily mean that monetary damages are

25  per se unavailable. *Cf. Uzuegbunam v. Preczewski*, 141 S.Ct. 792, 799-800 (2021)

26  (recognizing that nominal damages are available to dress past harm from First

27  Amendment violations). While it may be the case that Plaintiffs are unable to prove a

28  concrete, non-abstract compensatory damages amount stemming from an actual injury

1   caused by the alleged Second Amendment violation, that question is not presently before

2   the Court. *See Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305-10 (1986)

3   (explaining that "the abstract value of a constitutional right may not form the basis for §

4   1983 damages"). But more importantly, these cases are not legally analogous to the

5   issues before the Court. Each cited cases involves a pre-enforcement challenge to a state

6   law, not a request for redress from a post-enforcement violation. As a matter of reason,

7   injunctive relief would be impossible to remedy Mr. Brizuela's harm—the alleged violation

8   has already occurred, and he is deceased. Because Defendants' argument is not

9   supported by the cases they cite, the Court finds they have failed to meet their burden

10  and will deny judgment on pleadings as to Claim 5.

11              **2.      Statute of Limitations for Title II of the ADA (Claim 9)**

12          Defendants' argument that the ADA claim is time-barred is also unpersuasive. The

13  original complaint was filed November 15, 2019—486 days after the incident that killed

14  Mr. Brizuela. (ECF No. 1.) Plaintiffs first asserted the ADA claim in the third amended

15  complaint, which was filed December 17, 2020—884 days after the incident. (ECF No.

16  55.) Defendants claim that the ADA claim is subject to a one-year statute of limitations,

17  so the claim is time-barred even assuming that it relates back to the filing of the original

18  complaint. (ECF No. 82 at 5.) Because the Court finds the applicable statute of limitations

19  is three years, Defendants' motion for partial judgment on the pleadings will be denied.

20          Because Title II of the ADA does not contain a statute of limitations, courts borrow

21  limitation period from the "most analogous state-law claim." *Sharkey v. O'Neal*, 778 F.3d

22  767, 770 (9th Cir. 2015). If no clearly analogous state-law claim exists, courts often defer

23  to the forum state's personal injury statute of limitations. *See id.* at 771. Plaintiffs' ADA

24  claim alleges that the City "discriminated against [Mr. Brizuela] on the basis of . . . his

25  disability by failing, refusing and/or neglecting to accommodate his disability during their

26  approach upon his person at his home and/or neglecting to consider [Mr. Brizuela's]

27  disabilities prior to using excessive force against [him]." (ECF No. 80 at 23.) Defendants

28  argue the most analogous Nevada law is Nevada's public accommodations statute, to

which a one-year statute of limitations applies. *See* NRS § 651.070 ("All persons are entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages and accommodations of any place of public accommodation, without discrimination or segregation on the ground of . . . disability . . ."); *id.* at § 651.120 (providing a one-year statute of limitation). Plaintiffs counter that the public accommodations statute is not analogous, and therefore either the two-year general personal injury statute of limitations should apply, *see id.* at § 11.190(4)(e), or the three-year statute of limitations for "[a]n action upon a liability created by statute, other than a penalty or forfeiture," *see id.* at § 11.190(3)(a).

Courts in this district have split on which limitation period applies to Title II claims. *Compare Belssner v. Nevada*, Case No. 2:15-cv-00672-APG-PAL, 2017 WL 2990848, at *2 (D. Nev. Jul. 12, 2017) (applying the one-year statute of limitation in NRS § 651.120), *and Porter v. Southern Nev. Adult Mental Health Servs.*, Case No. 2:16-cv-02949-APG-PAL, 2017 WL 6379575, at *3 (D. Nev. Dec. 13, 2017) (same), *with Funke v. Hatten*, Case No. 2:19-cv-01335-RFB-EJY, 2021 WL 2346003, at *8-9 (D. Nev. Jun. 9. 2021) (applying the two-year statute of limitation in NRS § 11.190(4)(e)). The plaintiff in *Belssner* did not oppose the state's argument that NRS § 651.120 applies. *See* 2017 WL 2990848 at *2. The *Porter* court disagreed with the plaintiffs' argument that Nevada's four-year "catch-all" statute of limitation applied to Title II claims because NRS § 651.120 was more analogous. *See* 2017 WL 6379575 at *3. But the *Funke* court compared Nevada's public accommodations statute with Title II and found that NRS § 651.070 was not analogous to the plaintiff's claim because the public accommodations statute tracks more closely with Title III, not Title II. *See* 2021 WL 2346003 at *9. The *Funke* court reasoned that the plaintiff—who asserted a Title II claim against police officers for failing to accommodate his mental health issues when the officers shot him while attempting to arrest him in a church plaza—was not seeking public accommodation, but rather freedom from discrimination in the city's performance of public services. *Id.* at *2-3, *9. The *Funke* court

1    did not consider whether the three-year statute of limitations in NRS § 11.190(3)(a) should

2    apply.

3         The Court agrees with Plaintiffs that NRS § 651.070 is not analogous to their Title

4    II claim. Mr. Brizuela was not seeking public accommodation when he was killed on his

5    patio. Instead, he expected accommodation for an alleged disability from the City's public

6    service: the Sparks Police Department's response and investigation of a reported

7    disruption. Accordingly, the Court finds Nevada's public accommodations statute is not

8    sufficiently analogous to Title II of the ADA or, more specifically, the claim that is here

9    alleged.

10        Moreover, the Court is persuaded that the three-year statute of limitations set forth

11   in NRS § 11.190(3)(a) applies to ADA Title II claims, rather than the two-year personal

12   injury statute provided in NRS § 11.190(4)(e). In *Sharkey*, the Ninth Circuit approved of

13   California state courts' reasoning that although liabilities created by public

14   accommodations statutes (including Title I of the ADA) are derived from common law,

15   liability arising under Title II is not—rather, the cause of action is instead created by

16   statute. *See* 778 F.3d at 771-73. In other words, the private cause of action created by

17   the Title II may analogize to common law tort, but the statute itself provides the claim. The

18   court then applied California's three-year statute of limitations to the plaintiff's Title II

19   claim, which applies to "[a]n action upon liability created by statute, other than a penalty

20   or forfeiture." Cal. Civ. Proc. Code § 338(a). The language in NRS § 11.190(3)(a) is

21   identical to California's three-year statute of limitations. Courts in Nevada have used the

22   three-year statute of limitation for claims that are created by statutes, even when those

23   claims may have analogues in tort.[4] Because the private right of action in Title II of the

24

25        [4]For example, in *Hanna v. K-Kel, Inc.*, Case No. 2:21-cv-00639-JCM-BNW,
     2022WL 181252, at *1-3 (D. Nev. Jan. 20, 2022), the district court found that Nevada's
26   hate crime statute created the private cause of action, so the three-year statute of
     limitation applied. Similarly, the Nevada Supreme Court explained that a negligence per
27   se claim brought under NRS § 240.150, which prohibits neglect or misconduct on the part
     of notaries public, was subject to the three-year statute of limitation because the cause of
28   action was created by statute. *See Torrealba v. Kesmetis*, 178 P.3d 716, 721 (Nev. 2008).

1    ADA was created by the ADA and, as the California courts have found,[5] do not have an

2    express source in common law, the Court adopts Nevada's three-year statute of

3    limitations for Title II ADA claims.

4        The ADA claim is timely. The Court will therefore deny Defendants' motion for

5    judgment on the pleadings on Claim 9.

6    **B.    Cross-Motions for Summary Judgment: Fourth Amendment Search**

7    **and Seizure (Claim 1)**

8        Plaintiffs and Defendants each move for summary judgment on Plaintiffs' first

9    claim, which alleges the Officers violated Mr. Brizuela's Fourth Amendment right to be

10   free from unreasonable searches and seizures. (ECF No. 80 at 10-11.) Plaintiffs argue

11   (1) the Officers' conduct constituted "both a search and a seizure" without a warrant, (2)

12   no exception to the warrant requirement applies, and (3) the Officers are not entitled to

13   qualified immunity. (ECF No. 87 at 22-33.) Defendants argue first that Mr. Brizuela lacked

14   a reasonable expectation of privacy in the walkway and the porch, so no Fourth

15   Amendment violation could have occurred. (ECF No. 91 at 19-22.) Defendants argue in

16   the alternative that no violation occurred because the Officers (1) had probable cause to

17   arrest Mr. Brizuela for violent felonies, (2) had reasonable suspicion required to detain

18

19

20        [5]The *Sharkey* court first found that California courts had established Title II was
     not derived from common law. *See* 778 F.3d at 773-74. No Nevada court has so found.
21   Additionally, the *Sharkey* court first analogized the plaintiff's Title II claim to California
     Government Code § 11135, to which California courts had previously applied the three-
22   year statute of limitations. *See id.* at 773. Here, Plaintiffs have not pointed to a Nevada
     law that would be analogous to the Title II claim. But the Court is still persuaded by the
23   reasoning in *Sharkey* that Title II is more similar to a claim created by statute than a claim
     deriving from common law tort, and therefore that NRS § 11.190(3)(a) is a more
24   appropriate statute of limitations for Title II claims.
          Still, even if the Court applied the two-year personal injury statute of limitations,
25   the result would be the same because Plaintiffs' ADA claim relates back to the original
     filing on November 15, 2019. An amended claim relates back to the date of the original
26   pleading when it "arose out of the conduct, transaction, or occurrence set out—or
     attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Here,
27   Plaintiffs argue that the City's failure to advise the Officers of Mr. Brizuela's history with
     suspected mental illness constituted a failure to reasonably accommodate his disability.
28   (ECF No. 80 at 23.) These allegations clearly arose out of the same incident initially
     pleaded in the original complaint.

1    Mr. Brizuela as part of an investigation, and (3) were constitutionally entitled to approach

2    Mr. Brizuela's home as part of a "knock and talk." (*Id.* at 23-29.)

3          As explained further below, the Court will grant Plaintiffs' motion for partial

4    summary judgment and will deny Defendants' motion for summary judgment as to Claim

5    1. The Court first finds there is no genuine dispute of material fact that a search occurred

6    and that the search was unreasonable under the Fourth Amendment. Second, the Court

7    finds a seizure occurred as a matter of law and that the seizure was unreasonable. Finally,

8    the Court concludes the Officers are not entitled to qualified immunity for either the search

9    or seizure because their actions violated Mr. Brizuela's clearly established rights.

10                        **1.    Search**

11          Defendants argue there was no Fourth Amendment search because neither area

12   that the Officers entered—the walkway or the porch—were Mr. Brizuela's real property or

13   part of his home's curtilage. (ECF No. 91 at 19.) Whether the areas adjoining the Brizuela

14   Residence legally belonged to Mr. Brizuela is not, however, dispositive of whether they

15   enjoy similar Fourth Amendment protections as did his home. *See Oliver v. United States*,

16   466 U.S. 170, 183 (1984). Instead, the Court focuses on whether any expectation of

17   privacy Mr. Brizuela had in the walkway or the porch was reasonable.

18          The Court finds an unreasonable search occurred in violation of Mr. Brizuela's

19   Fourth Amendment rights. Because the porch is part of the curtilage of his home, Mr.

20   Brizuela's expectation of privacy there was objectively reasonable. Because reasonable

21   jurors could differ about whether Mr. Brizuela had an objectively reasonable expectation

22   of privacy in the walkway, the Court declines to grant summary judgment to either party

23   on whether a search occurred by the Officers entering the walkway without Mr. Brizuela's

24   consent. But irrespective of whether Mr. Brizuela had a reasonable expectation of privacy

25   in the walkway, summary judgment is appropriate because the Officers were on the porch

26   for the majority of the encounter.

27   ///

28   ///

26

1

### a.   Legal Standard

2   "The Fourth Amendment protects the right of the people to be secure in their

3   'persons, houses, papers, and effects' against unreasonable searches and seizures."

4   *Patel v. City of Los Angeles*, 738 F.3d 1058, 1061 (9th Cir. 2013) (quoting U.S. Const.

5   amend. IV). "A search occurs for Fourth Amendment purposes when the government

6   physically intrudes upon one of these enumerated areas, or invades a protected privacy

7   interest, for the purpose of obtaining information." *Id.* (citing *United States v. Jones*, 565

8   U.S. 400, 404 (2012)).

9   "[W]hen it comes to the Fourth Amendment, the home is first among equals."

10   *Florida v. Jardines*, 569 U.S. 1, 6 (2013). "At the Amendment's 'very core' stands 'the

11   right of a man to retreat into his own home and there be free from unreasonable

12   government intrusion.'" *Id.* (quoting *Silverman v. United States*, 365 U.S. 505, 511

13   (1961)). "To give full practical effect to that right, the Court considers curtilage—'the area

14   immediately surrounding and associated with the home'—to be 'part of the home itself for

15   Fourth Amendment purposes.'" *Collins v. Virginia*, 138 S.Ct. 1663, 1670 (2018) (quoting

16   *Jardines*, 569 U.S. at 6); *see also Jardines*, 569 U.S. at 7 (describing the curtilage as

17   "intimately linked to the home, both physically and psychologically," and "where privacy

18   expectations are most heightened") (internal quotation and citation omitted). "When a law

19   enforcement officer physically intrudes on the curtilage to gather evidence, a search

20   within the meaning of the Fourth Amendment has occurred." *Collins*, 138 S.Ct. at 1670.

21   Although Fourth Amendment jurisprudence was originally "tied to common-law

22   trespass," the Supreme Court recognized that modern cases "deviated from that

23   exclusively property-based approach" and additionally focuses on whether the

24   government "violate[s] a person's 'reasonable expectation of privacy.'" *Jones*, 565 U.S.

25   at 406 (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967)). Tracking with this

26   development, the Court has clarified that an individual does have a reasonable

27   expectation of privacy in the curtilage of their home because the curtilage is treated as

28   the home for Fourth Amendment purposes. *See Oliver v. United States*, 466 U.S. 170,

180 (1984). By contrast, spaces adjacent to a home that are not within the curtilage are "open fields" that enjoy no Fourth Amendment protection at all. *See id.* ("[N]o expectation of privacy legitimately attaches to open fields."). This is the case even if the government's intrusion upon the open field would be a trespass at common law. *See id.* at 183 ("The existence of a property right is but one element in determining whether expectations of privacy are legitimate.").

In *United States v. Dunn*, the Supreme Court outlined four factors courts should use when determining whether an area is curtilage: (1) "the proximity of the area . . . to the home"; (2) "whether the area is included within an enclosure surrounding the home"; (3) "the nature of the uses to which the area is put"; and (4) "the steps taken by the resident to protect the area from observation by people passing by." 480 U.S. 294, 301 (1987). Moreover, the Supreme Court has recognized certain areas as definitively part of the curtilage of a home, including "the front porch, side garden, or area 'outside the front window.'" *Collins*, 138 S.Ct. at 1671; *see also Jardines*, 569 U.S. at 7 (describing the front porch as the "classic exemplar" of curtilage).

### b. Reasonable Expectation of Privacy

The first question is whether Mr. Brizuela had a reasonable expectation of privacy in the areas surrounding his home that the Officers encroached upon. There are three areas at issue in this case: the patio, the porch, and the walkway. The parties do not dispute that the patio is part of the Brizuelas' curtilage, but whether the porch and the walkway are included in the curtilage is disputed.[6]

---

[6]Mrs. Brizuela initially declared that she "owned . . . the house and its front porch (on which the officers were standing in the July 17, 2018, incident) and the patio (where Rolando was standing when the officers shot him." (ECF No. 87 at 37.) In a supplement to their motion for partial summary judgment, Plaintiffs submitted a declaration from Mrs. Brizuela which stated in relevant part: "By using the word 'owned' (in my prior declaration), I simply meant that we have always had exclusive use of the front porch, in that no other resident (or non-resident) has ever used the front porch for their benefit (or attempted to do so)." (ECF No. 97 at 3.) Defendants moved to strike this declaration on the grounds that neither the original nor the amended statements are accurate, and Plaintiffs did not seek leave from the Court before filing their supplemental declaration in violation of LR 7-2(g). The Court agrees that the supplemental declaration was not properly filed and will strike it. Regardless, and as further explained herein, whether the Brizuelas owned the patio, porch, or walkway is not dispositive of the issues before the Court.

The porch is part of the curtilage of the Brizuela Residence. As the Supreme Court explained succinctly in *Jardines*, the front porch is "the classic exemplar" of curtilage. *See* 569 U.S. at 7. It is inconsequential that the land itself may be owned by Yorkshire Manor— the two steps adjacent to the Brizuela's front door and patio are clear analogues to the porch of a single-family home. The porch is no more than a few feet from the home's entrance and from the porch, the Officers were able to (and did) peer over the fence into the enclosed patio. Standing on the porch brought the Officers as close to the home as they could be without being inside the home itself. From that point, the Officers were able to block the patio gate, knock on the front door, converse with Mrs. Brizuela while she kept the metal screen on the front door closed, and observe Mr. Brizuela's movements on the patio. Moreover, the porch led only to the Brizuela's front door and patio, not to any other residence. That the porch was viewable from the street and unenclosed does not change its proximity to and intimate connection with the Brizuelas' home. Considering the *Dunn* factors in their totality, along with the Supreme Court's clear directive in *Jardines*, the porch is clearly part of the Brizuelas' curtilage.

Defendants' arguments that the porch is not part of the Brizuelas' curtilage are not persuasive. In their motion, Defendants analogize to cases involving hotel hallways, apartment complex garages, and entrances to condominiums, claiming that because this area is owned and maintained by Yorkshire Manor and any number of people had legal access to use the space, there was no expectation that the walkway was private. (ECF No. 91 at 20.) *See, e.g.*, *United States v. Nohara*, 3 F.3d 1239, 1241-42 (9th Cir. 1993) (finding there was no objectively reasonable expectation of privacy in the hallway of a high-rise apartment building); *United States v. Boyajian*, Case No. CR 09-933-CAS, 2015 WL 9239703, at *3 (C.D. Cal. Dec. 17, 2015) (collecting cases suggesting a person does not have an objectively reasonable expectation of privacy in the common areas of a guesthouse or hotel). But the Ninth Circuit has clarified that not all multi-unit complexes are alike, distinguishing a case in which the person searched "lived in one of only two apartments as opposed to a multi-unit complex." *Nohara*, 3 F.3d at 1242 (comparing to

29

*United States v. Fluker*, 543 F.2d 709, 716 (9th Cir. 1976)). Moreover, these cases are analogous only to the walkway—they do not suggest that any expectation of privacy in the front porch of a home would be unreasonable.

Here, the Brizuelas' porch and walkway both are distinguishable from the common areas in the cases to which Defendants cite. Notably, the walkway leads only to the Brizuela Residence—each door of the fourplexes has its own entrance, and each entrance has its own access point from the street. Although both the porch and the walkway are in open view and accessible by the public, they connect the sidewalk to the Brizuela Residence and to that home alone. Both the porch and walkway would be normally and regularly used only for visitors to the Brizuela Residence or by Yorkshire Manor maintaining the property, not by any other resident, other residents' guests, or members of the public. In these respects, the Brizuela Residence is more analogous to a single-family home than a high-rise apartment building's hallway, which connects many residents and their guests to several units, or a hotel or guest house, through which many guests, visitors, or members of the public may pass at any given time. The expectation of the family's privacy in those spaces is therefore preserved, even though those areas are not a part of their real property. Moreover, determining whether the walkway is also part of the curtilage is unnecessary to resolve Plaintiffs' claim that a search occurred. Indeed, whether the walkway is part of the curtilage would present a closer question[7], but ultimately one of lesser value as the Officers were both standing on the porch when confronting Mr. Brizuela.

Because the Court finds the porch was unquestionably part of the home's curtilage, Mr. Brizuela's expectation of privacy in his porch was objectively reasonable and the Officers' presence there constitutes a search under the Fourth Amendment. Given that

---

[7]Considering the facts in the light most favorable to Plaintiffs, the Court concludes that a reasonable juror could find that the short pathway leading from the street to his front door was effectively part of his home, and that his expectation of privacy in the walkway was therefore objectively reasonable. However, a reasonable juror could similarly find the walkway was exposed to public view and served only as a space connecting the home to the street but was not itself so intimately associated with the home as to justify a finding that it is part of the curtilage.

the Officers lacked a search warrant, their presence on the porch must fall within an exception to the warrant requirement; otherwise, it is an unreasonable search of the home. *See Patel*, 738 F.3d at 1061. The Court therefore considers Defendants' justifications for the Officers' presence on the porch.

### c.      Knock and Talk Exception

Defendants argue that even if they had encroached upon an area protected by the Fourth Amendment, their presence was constitutionally permissible due to the "knock and talk" exception to the warrant requirement. (ECF No. 91 at 26.) The Ninth Circuit recognizes an exception that "permits law enforcement officers to 'encroach upon the curtilage of the home for the purpose of asking questions of the occupants.'" *United States v. Lundin*, 817 F.3d 1151, 1158 (9th Cir. 2016). "An officer does not violate the Fourth Amendment by approaching a home at a reasonable hour and knocking on the front door with the intent merely to ask the resident questions, even if the officer has probable cause to arrest the resident." *Id.* at 1160. The exception "resembles to some degree the exception for consensual searches." *Id.* at 1158. But the exception's scope "is coterminous with [the] implicit license" to "approach the home and knock." *Id.* at 1158-59. In other words, if the police do not have a warrant, they may "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 U.S. at 8.

The Officers' conduct here does not comport with the "implicit license" explained in *Lundin* and *Jardines*. The source of that license is consent, *see Lundin*, 817 F.3d at 1158-59, which Mr. Brizuela expressly denied the Officers first when he undisputedly told them to leave (first while they were approaching his home, then repeatedly when they remained on his porch after he had closed the gate in their faces), second when he undisputedly told Mrs. Brizuela not to open the door for the Officers, and third when he undisputedly told the Officers to stop knocking on the door. At no point did the encounter resemble that of a member of the public knocking at the door of a residence to engage in a consensual conversation with its inhabitants. Instead, the Officers undisputedly

1   questioned Mr. Brizuela while ignoring his requests to end the encounter. Based on these

2   undisputed facts, the knock and talk exception to the warrant requirement therefore does

3   not apply here.

4               d.      **Probable Cause Arrest**

5               Defendants next argue they were entitled to approach the house to make a

6   warrantless probable cause arrest. (ECF No. 91 at 24.) "The Fourth Amendment ordinarily

7   requires that police officers get a warrant before entering a home without permission."

8   *Lange v. California*, 141 S.Ct. 2011, 2016 (2021). "[W]arrantless felony arrests in the

9   home are prohibited by the Fourth Amendment, absent probable cause and exigent

10  circumstances." *Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984) (citing *Payton v. New

11  York*, 445 U.S. 573, 583-90 (1980)). Although the Supreme Court has recognized certain

12  emergencies that would justify a warrantless home arrest—hot pursuit of a fleeing felon,

13  destruction of evidence, and an ongoing fire—the Court has expressed "hesitation" to

14  expand the exception, especially "when the underlying offense for which there is probable

15  cause to arrest is relatively minor." *Id.* at 750 (collecting cases). Moreover, "no exigency

16  is created simply because there is probable cause to believe that a serious crime has

17  been committed." *Id.* at 753.

18              Assuming Defendants had probable cause to arrest Mr. Brizuela for robbery and

19  child abuse, as they claim, Defendants' argument fails because they have not identified—

20  nor even argued—that any exigent circumstances were present that would support

21  encroachment on Mr. Brizuela's curtilage.[8] For more than 40 years, the Supreme Court

22  has recognized that warrantless arrests within a home, even when supported by probable

23  cause, are impermissible absent exigent circumstances. *See Welsh*, 466 U.S. at 749.

24  Ignoring that precedent, Defendants unsuccessfully attempt to analogize the permissible

25  arrest in *United States v. Santana*, 427 U.S. 38, 42 (1976), to the facts here. (ECF No. 91

26

27              [8]In their reply. Defendants state there were "multiple exigencies that allowed them
    to enter and remain upon the property," but fail to describe what those exigencies were.
28  (ECF No. 107 at 9.) Even if the Court were to consider a new argument raised in the reply,
    Defendants fail to articulate how the facts support a finding that exigent circumstances
    justified their presence.

at 24-25.) The Supreme Court held in *Santana* that police officers could approach and even enter the interior of Santana's home to complete her arrest because she had initially shown herself in the doorway. *See id.* But four years after *Santana* was decided, the Supreme Court decided *Payton v. New York*, 445 U.S. 573, 584-600 (1980), again addressing what circumstances justified warrantless arrests within the home. *See also Collins*, 138 S.Ct. at 1672 (citing the exigent circumstances requirement for a warrantless home arrest in *Payton* as a "settled rule"). In *Payton*, the Court explained that the permissibility of public warrantless arrests is derived from similar common law principles that undergird the plain view exception. 445 U.S. at 587. But the Court further considered the tension between the tolerance of warrantless arrests supported by probable cause and the strong protection the Fourth Amendment grants to the home, reasoning that a warrantless arrest in the home implicates the sanctity of an intimate space as well as the seizure of the person. *Id.* The Court then clarified that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590.

Even if *Santana* would have been decided the same way after *Payton* (and further assuming that it did create some type of categorical rule[9]), the facts of *Santana* are distinguishable from those here. The *Santana* Court predicated its reasoning on the showing that Santana was fleeing the police and the hot pursuit exception to the warrant requirement applied. *See* 427 U.S. at 42-43. Specifically, the Court reasoned that the need to detain Santana to prevent the destruction of narcotics evidence justified the warrantless intrusion, as the officers could not wait to obtain a warrant. *See id.* at 43. Here, Defendants have made no showing that evidence needed to be preserved, nor that Mr. Brizuela was fleeing—indeed, Mr. Brizuela remained on the patio and continued asking the officers to leave while telling them that he believed they were violating their rules. Moreover, the *Santana* Court reasoned that the arrest had been put in motion while

---

[9] *See Lange v. California*, 141 S.Ct. 2011, 2019 (2021) (rejecting a "broad" reading of *Santana* and declining to address whether *Santana* failed to create "*any* categorical rule") (emphasis in original).

1   Santana was "exposed to public view, speech, hearing, and touch as if she had been

2   standing completely outside her house." [10]  *Id.* at 42. But when the Officers approached

3   the Brizuela Residence, Mr. Brizuela was already within his enclosed patio with the gate

4   closed and only the top of his head visible. (ECF No. 93-2 at 17:36.)

5       The facts here are more like those in *United States v. Struckman*, 603 F.3d 731,

6   744 (9th Cir. 2010), in which the Ninth Circuit found no exigent circumstances justified a

7   warrantless arrest in the suspect's backyard. In *Struckman*, the suspect was "already

8   inside the backyard when the police officers arrived at his house," and although he had

9   not yet been handcuffed or taken into custody, the suspect "made no attempt to escape

10  the yard." *Id.* The Ninth Circuit concluded that because the suspect was within his yard,

11  there was no chase or hot pursuit. *Id.* The same conclusion applies here: even if

12  Defendants had cogently argued that Mr. Brizuela was attempting to escape, the fact that

13  he was completely contained within his patio and did not try to leave would make such an

14  argument one that no reasonable juror could accept. Accordingly, even assuming the

15  Officers had probable cause to arrest Mr. Brizuela, their sustained presence on his porch

16  without a search warrant was not justified.

17      In sum, the Officers encroached upon the curtilage of the Brizuela Residence when

18  they remained on the porch without a warrant, without exigent circumstances, and without

19  Mr. Brizuela's consent. Their presence was, as a matter of law, an unreasonable,

20  warrantless search that did not fall within any exception to the warrant requirement. The

21  Court accordingly denies Defendants' motion for summary judgment and grants Plaintiffs'

22  motion for summary judgment as to the unreasonable search portion of Claim 1.

23  ///

24  ///

25

26      [10]Sullivan stated in his deposition that the "plan" when he and Maile approached
27  the home was not arrest Mr. Brizuela, but to detain him and investigate the reported
    activity. (ECF No. 93-4 at 22.) Maile states that he understood their conversation as
28  intending to arrest Mr. Brizuela for the robbery of the skateboard. (ECF No. 93-8 at 14.)
    The conflicting statements complicate the analogy to *Santana*, in which the officers stated
    they had already put the arrest in progress in a public place.

1

2. **Seizure**

2      Plaintiffs further argue the Officers unlawfully seized Mr. Brizuela in violation of his

3    Fourth Amendment rights. Specifically, Plaintiffs assert that the Officers seized Mr.

4    Brizuela when they questioned him while blocking the patio gate because a reasonable

5    person would not have felt free to ignore the Officers and go about their business. (ECF

6    No. 87 at 23.) Defendants principally argue that their warrantless intrusion was justified,

7    but also argue that because Mr. Brizuela did not withdraw into the interior of his home,

8    his continued presence indicated their conversation was voluntary. (ECF No. 91 at 28.)

9      As explained above, the Officers failed to demonstrate exigent circumstances that

10   would justify a home arrest, even one supported by probable cause. The only questions

11   that remain are whether (1) the encounter was consensual and (2) if it was not

12   consensual, if the Officers were permitted to detain Mr. Brizuela in his home without a

13   warrant based on reasonable suspicion. Because the encounter was not consensual and

14   the Officers were not permitted to detain Mr. Brizuela in his home without a warrant, the

15   Court will grant Plaintiffs' partial motion for summary judgment and deny Defendants'

16   motion for summary judgment as to the unreasonable seizure portion of Claim 1.

17

a.      **Legal Standard**

18      "A person is seized under the Fourth Amendment 'when there is a governmental

19   termination of freedom of [their] movement through means intentionally applied.'"

20   *Villaneuva v. California*, 986 F.3d 1158, 1166 (9th Cir. 2021) (quoting *Brower v. Cnty. of

21   Inyo*, 489 U.S. 593, 597 (1989)). The government terminates a person's freedom of

22   movement when, "in view of all the circumstances surrounding the incident, a reasonable

23   person would have believed that he was not free to leave." *United States v. Mendenhall*,

24   446 U.S. 544, 554 (1980).

25      It follows that "a seizure does not occur simply because a police officer approaches

26   an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "So

27   long as a reasonable person would feel free 'to disregard the police and go about his

28   business,' the encounter is consensual and no reasonable suspicion is required." *Id.*

1   (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). Fourth Amendment scrutiny

2   is triggered only when the encounter "loses its consensual nature." *Id.* "When a person

3   'has no desire to leave' for reasons unrelated to the police presence, the 'coercive effect

4   of the encounter' can be measured better by asking whether 'a reasonable person would

5   feel free to decline the officers' requests or otherwise terminate the encounter.'" *Brendlin*

6   *v. California*, 551 U.S. 249, 255 (2007) (quoting *Bostick*, 501 U.S. at 435-36).

### b.    Seizure and Consent

8          Defendants offer no facts supporting their assertion that the encounter was

9   consensual. Instead, they reason that because there was a sliding glass door on the patio,

10  Mr. Brizuela could have gone inside his home at any time, implying that his choice to

11  remain on the patio indicated his consent to the encounter with the Officers. (ECF No. 91

12  at 28.) Defendants further reason that the Officers did not make "any verbal or physical

13  show of force or authority" until Mr. Brizuela picked up his firearm. (*Id.*)

14         Whether Mr. Brizuela could have withdrawn into the interior of his home is of no

15  consequence. The parties do not dispute that the enclosed patio is part of the curtilage of

16  the Brizuela Residence. For Fourth Amendment purposes, the curtilage and the home

17  are treated as one. *See Collins*, 138 S.Ct. at 1670. Mr. Brizuela was not withdrawing from

18  a public place to a private place while the Officers questioned him—he was at all times

19  within a private place, his home.[11] While the interior of a house may be conceptually

20  different from an enclosed patio as a matter of common sense, they are indistinguishable

21  as a matter of law for the purposes of the Fourth Amendment. The parties do not cite to

22  any caselaw, nor has the Court found any authority, that supports the proposition that a

23  person who is confined to one area of his home may simply move to another space and

24  no longer be seized.

25

26  [11]As explained above, the circumstances in *Santana* are inapposite. Although
    there are some factual similarities about the two encounters, the police officers in *Santana*
27  were pursuing a fleeing felon during an arrest that moved from a public place into the
    interior of Santana's home. Here, the time between the Officers' initial approach, eventual
28  questioning, and escalation while they remained at all times on the porch make the arrest
    too attenuated from their initial encounter in the more public road, or even from the time
    that Mr. Brizuela stood in the gateway of the patio.

But even if retreating into the interior of his house would have made a difference for Fourth Amendment purposes, the undisputed facts do not support Defendants' argument that a reasonable person would have felt free to do so. From the moment the Officers approached the Brizuela Residence, Mr. Brizuela indicated he did not consent to their presence. As they walked up the walkway, Mr. Brizuela said, "you cannot come in here." (ECF No. 87-5 at 22.) When Sullivan asked if Mr. Brizuela would come out and speak with the Officers, Mr. Brizuela responded, "No, I don't have—I don't—I have nothing to talk to you. You cannot come in here without a judge order," then telling the Officers, "Turn around and leave." (*Id.*) The Officers had approached the Brizuela Residence at night and had to shine a light onto Mr. Brizuela's face to see him. (ECF No. 93-2 at 14:29, 17:38.) He stepped partially onto the porch only to tell the Officers that they could not come in without a warrant. (*Id.* at 17:47.) The Officers continued to approach the porch, asking Mr. Brizuela for his name as he closed the gate in their face. (*Id.* at 17:49-50.) As the Officers stood on the porch in front of the gate and continued to shine their flashlights into the patio, Mr. Brizuela asked if the Officers were going to arrest him, told the Officers that they were breaking their own rules, and repeated that because this was his property, the Officers needed a warrant before entering. (*Id.* at 17:50-59.)

Here, the Officers remained on the porch and blocked Mr. Brizuela's exit from his home, confining him within his patio. Because they remained on his porch after he told them to leave and continued to question him from his porch, the Court finds that Mr. Brizuela was seized as a matter of law.

### c.    Reasonable Suspicion to Detain

Defendants argue in the alternative that even if Mr. Brizuela had been seized, the seizure was justified because they had reasonable suspicion to detain Mr. Brizuela to perform an investigatory stop. (ECF No. 91 at 25-26.) Defendants provide no authority, however, that indicates they are entitled to detain a person within the curtilage of their home without a warrant for the purpose of asking them questions relating to an investigation of a crime. The argument appears to stem from Defendants'

1  misapprehension that the porch is not a part of the home's curtilage, and that
2  consequently their presence on the porch therefore kept them outside of the home in a
3  public place. But even assuming that were true, Mr. Brizuela was undisputedly within the
4  curtilage while standing within his enclosed patio. The Officers' presence is more
5  appropriately considered a knock-and-talk which, as explained above, violates Mr.
6  Brizuela's Fourth Amendment rights if they remained after he told them to leave. As
7  further explained above, the lack of exigent circumstances likewise meant that an arrest—
8  even supported by probable cause—would have been impermissible because Mr.
9  Brizuela was within the curtilage of his home.

10      Accordingly, Mr. Brizuela's detention or arrest in the patio did not fall within any
11  exception to the warrant requirement and was therefore impermissible under the Fourth
12  Amendment.

13      **3.    Qualified Immunity**

14      Defendants argue that even if a Fourth Amendment violation occurred, they are
15  entitled to qualified immunity because the Officers' belief that they could approach the
16  front area of the Brizuela Residence without a warrant to either detain or arrest Mr.
17  Brizuela was reasonable. (ECF No. 91 at 61-62.) There is clearly established Supreme
18  Court precedent holding that the front porch of a home is the "exemplar" of curtilage, and
19  that curtilage is treated as part of the home for Fourth Amendment purposes. Moreover,
20  the undisputed evidence shows Mr. Brizuela was unlawfully seized within his home
21  without a warrant, despite clearly established law that such a seizure requires exigent
22  circumstances. Accordingly, the Court will deny Defendants' summary judgment motion
23  on the question of qualified immunity for Claim 1 and grants summary judgment in
24  Plaintiffs' favor.

25      **a.    Legal Standard**

26      "In determining whether a state official is entitled to qualified immunity in the
27  context of summary judgment, [courts] consider (1) whether the evidence viewed in the
28  light most favorable to the plaintiff is sufficient to show a violation of a constitutional right

and (2) whether that right was 'clearly established at the time of the violation.'" *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 670 (9th Cir. 2021) (quoting *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 592 (9th Cir. 2019)). "Whether a constitutional right is clearly established is purely a question of law for the court to decide." *Gordon*, 6 F.4th at 968. A defendant is not entitled to qualified immunity "simply because 'the very action in question has [not] previously been held unlawful.'" *Sandoval*, 985 F.3d at 680 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "State '[o]fficials can still be on notice that their conduct violates established law even in novel factual circumstances'—i.e., even without a prior case that had 'fundamentally similar' or 'materially similar' facts.'" *Id.* (internal citations omitted). "The [individual defendant's] actual subjective appreciation of the risk is not an element of the established-law inquiry." *Id.* at 678.

Courts must not define clearly established law "at too high a level of generality." *City of Tahlequah, Okla. v. Bond*, 142 S.Ct. 9, 11 (2021). A rule that is "suggested" by precedent is not enough; instead, "the 'rules contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (citation omitted). In other words, "[a] right is clearly established when it is 'sufficiently clear that everyone reasonable official would have understood what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 142 S.Ct. 4, 7-8 (2021) (citation omitted). The reviewing court must consider the qualified immunity analysis "in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

### b. Analysis

Plaintiffs are entitled to summary judgment on Defendants' qualified immunity defense for both the search and seizure portions of Claim 1. First, Mr. Brizuela's right to be free from unreasonable searches was violated and that right, in the context of the specific facts presented, was clearly established. The Supreme Court has clearly stated that porches are part of the curtilage of a home, and that the curtilage is treated as the home for Fourth Amendment purposes. *See Jardines*, 569 U.S. at 6; *Collins*, 138 S.Ct. at

1670. More specifically, any reasonable officer would know that standing on a step just feet from the front door of a house and peering over a fence into an enclosed patio would constitute encroaching on the curtilage of a home. Mr. Brizuela had an objectively reasonable expectation of privacy on his patio and his porch, and the Officers' presence there after he told them to leave infringed upon that right, despite clearly established law prohibiting such an action.

Second, Mr. Brizuela's right to be free from a warrantless seizure within his home absent exigent circumstances is also clearly established. The Supreme Court has clearly and repeatedly held that warrantless seizures, even those supported by probable cause, are prohibited unless a recognized exigent or emergent circumstance justifies the seizure before a warrant can be obtained. *See Payton*, 445 U.S. at 587. Defendants have not articulated that any recognized exigent circumstances were present here, despite more than 40 years of precedent emphasizing the additional privacy protections people are entitled to in their homes. The undisputed facts show that nothing prevented the Officers from obtaining an arrest warrant once they saw that Mr. Brizuela had gone inside his patio, yet they persisted in unlawfully detaining him there without a warrant.

In sum, the Court grants Plaintiffs' and denies Defendants' summary judgment motions as to the search portion of Claim 1 because their unreasonable search of the Brizuelas' curtilage was contrary to clearly established law. Likewise, the Court grants Plaintiffs' and denies Defendants' summary judgment motions as to the seizure portion of Claim 1 because the undisputed facts show that Mr. Brizuela was seized within his home without a warrant and without exigent circumstances to support a probable cause arrest in the home.

## C.    Defendants' Motion for Summary Judgment: Claims 2-12

The Court next examines Defendants' summary judgment arguments on the remaining 11 claims, addressing each in turn. As explained further below, the Court will grant Defendants' motion in part as to Claim 3, but will deny their motion in part as to Claims 2 and 4-12.

1          **1.     Fourth Amendment: Excessive Force (Claim 2)**

2          Plaintiffs allege that the Officers' use of deadly force was, under the circumstances,

3    excessive and unreasonable in violation of Mr. Brizuela's Fourth Amendment rights. (ECF

4    No. 80 at 12.) Defendants counter that by picking up his firearm, Mr. Brizuela posed a

5    threat to both the Officers and Mr. Brizuela's neighbor, Shelly Register, who was sitting

6    on her porch behind the Officers. (ECF No. 91 at 29.) Because Mr. Brizuela had

7    threatened them with a firearm, they argue, they were entitled to use deadly force. (*Id.*)

8    As explained further below, several disputes of material fact preclude finding the Officers'

9    use of force was objectively reasonable under the circumstances, and because

10   Defendants have failed to show they are entitled to qualified immunity, the Court will deny

11   Defendants' summary judgment motion as to Claim 2.

12          **a.     Legal Standard**

13          "Excessive force claims are founded on the Fourth Amendment right to be free

14   from unreasonable seizures of the person." *Shafer v. County of Santa Barbara*, 686 F.3d

15   1110, 1115 (9th Cir. 2017) (citing U.S. Const. amend. IV and *Graham v. Connor*, 490 U.S.

16   386, 394-95 (1989)). "Determining whether the force used to effect a particular seizure is

17   'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and

18   quality of the intrusion on the individual's Fourth Amendment interests' against the

19   countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting

20   *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). "The 'reasonableness' of a particular seizure

21   depends not only on *when* it is made, but also on *how* it is carried out." *Graham*, 490 U.S.

22   at 395. When assessing reasonableness, courts must allow for the fact that "police

23   officers are often forced to make split-second judgments—in circumstances that are

24   tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a

25   particular situation." *Id.*, 490 U.S. at 396-97. Accordingly, "[e]xcessive force claims . . .

26   are evaluated for objective reasonableness based upon the information the officers had

27   when the conduct occurred." *Saucier v. Katz*, 533 U.S. 194, 207 (2001). The appropriate

28   question is "whether the officers' actions are 'objectively reasonable' in light of the facts

and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. Put more directly, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.*

When evaluating the strength of the government's interest in the force used, courts consider "'the type and amount of force inflicted,'" as well as three factors as outlined in *Graham v. Connor*: "'(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat of safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.'" *O'Doan v. Sanford*, 991 F.3d 1027, 1037 (9th Cir. 2021) (quoting *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)). "Among these considerations, the 'most important' is the second factor—whether the suspect posed an immediate threat to others." *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1153 (9th Cir. 2022) (citation omitted).

But the three *Graham* factors are "not exclusive." *O'Doan*, 991 F.3d at 1033. "Other factors relevant to the reasonableness of force 'include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed.'" *Isayeva v. Sacramento Sheriff's Dep't*, 672 F.3d 938, 947 (9th Cir. 2017) (quoting *Glenn v. Washington Cnty.*, 673 F.3d 864, 870 (9th Cir. 2011)). Although law enforcement officers "need not avail themselves of the least intrusive means of responding to an exigent situation," they are "required to consider [w]hat other tactics if any were available." *Glenn*, 673 F.3d at 876 (internal quotations and citations omitted). "[I]f there were 'clear, reasonable and less intrusive alternatives' to the force employed, that 'militate[s] against finding [the] use of force reasonable.'" *Id.* (quoting *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010)). "Even when an emotionally disturbed individual is 'acting out and inviting officers to use deadly force, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a

1    person who has committed a serious crime against others, but with a mentally ill
2    individual." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001).

3         The Ninth Circuit has repeatedly cautioned that "summary judgment should be
4    granted sparingly in excessive force cases." *Estate of Lopez by and through Lopez v.*
5    *Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017). Particularly in situations where the allegedly
6    excessive force killed the person subject to the seizure, courts must "carefully examine
7    all the evidence in the record, such as medical reports, contemporaneous statements by
8    the officer and the available physical evidence, . . . to determine whether the officer's
9    story is internally consistent and consistent with other known facts." *Gonzalez v. City of*
10   *Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014). Such scrutiny is required to "ensure that the
11   officer is not taking advantage of the fact that the witness most likely to contradict [their]
12   story—the person shot dead—is unable to testify." *Id.*

13                              **b.    Analysis**

14        Multiple factual disputes preclude granting summary judgment to Defendants on
15   Plaintiffs' excessive force claim. Critically, it remains disputed whether Mr. Brizuela raised
16   his weapon to point it at the Officers, which dispositively shapes the Court's analysis of
17   the second ("most important") *Graham* factor. *See Williamson*, 23 F.4th at 1153. If Mr.
18   Brizuela had raised his gun to threaten the Officers, they would be justified in using deadly
19   force to prevent harm to themselves or others; conversely, because mere possession of
20   a firearm does not justify using deadly force, their decision to shoot Mr. Brizuela likely
21   would be unjustified if he did not raise his weapon. *See Hayes v. Cnty. of San Diego*, 736
22   F.3d 1223, 1233 (9th Cir. 2013). The factual dispute about whether Mr. Brizuela
23   threatened the Officers precludes final disposition of Claim 2 on summary judgment.

24        Even though no witness has directly rebutted the Officers' account of what
25   happened, additional scrutiny is warranted when evaluating whether a factual dispute
26   exists. Because the Officers killed Mr. Brizuela, the only other witness to the events, the
27   Court must carefully examine whether their recitation of events are supported by all the
28   evidence. *See Gonzalez*, 747 F.3d at 795. Here, the facts do not unquestionably support

1   the Officers' testimony that Mr. Brizuela faced them and raised his gun when they opened

2   fire. The Officers' body cam recordings are crucial pieces of evidence, but unfortunately

3   do not clearly depict what transpired. Mr. Brizuela is occasionally visible and audible

4   during the encounter, but for the bulk of the encounter he is not. Both Officers state that

5   Mr. Brizuela picked up his gun and held it at his side, then the Officers ordered him

6   repeatedly to drop the gun for over 30 seconds. When Mr. Brizuela raised the gun, they

7   began to fire. But Mr. Brizuela is not clearly visible from either Sullivan or Maile's body

8   cam recordings when they begin to shoot—the cameras face the fence, and Mr. Brizuela's

9   movements between the slats are difficult to observe. (ECF Nos. 93-2 at 19:28; 93-9 at

10  17:26.)

11          Plaintiffs' expert witness Roger Clark states Mr. Brizuela is visible facing east

12  toward the street when the Officers begin to shoot, not facing the Officers who are

13  standing north of him. (ECF No. 102-29 at 21.) Per Clark's conclusion, Mr. Brizuela's left

14  side would be nearest to the Officers, with his gun in his right hand. (*Id.*) When non-party

15  Officer Loeschner enters the patio after the shooting, his body cam recording reflects Mr.

16  Brizuela's body face down with his feet nearer to the gate and his head away from the

17  gate. (ECF No. 93-6 at 5:04.) As Loeschner moves Mr. Brizuela's right arm to place Mr.

18  Brizuela in handcuffs, the gun Mr. Brizuela had been holding is visible on the ground

19  partially under his body. (*Id.* at 5:10-12.) Additionally, the autopsy report indicates that all

20  but one bullet entered Mr. Brizuela from the back to the front of his body. (ECF No. 102-

21  13.)

22          The Court concludes, in light of the evidence presently before it and viewing that

23  evidence in the light most favorable to Plaintiffs, that Plaintiffs have cast sufficient doubt

24  upon the Officers' rendition of events such that a rational factfinder could reasonably find

25  that Mr. Brizuela was not facing the Officers and did not raise his gun. Even assuming (1)

26  the underlying offense (pushing or punching N.A. and taking his skateboard) was

27  sufficiently "severe," (2) Mr. Brizuela's actions could be characterized as resisting arrest,

28  (3) the Officers' orders to drop the gun constituted proper warnings, and (4) the Officers

1   reasonably and genuinely did not know that Mr. Brizuela was suffering from mental

2   illness—all of which are reasonably disputed—the factual disputes about the threat Mr.

3   Brizuela posed the Officers preclude summary judgment in Defendants' favor.

4                                    **c.    Qualified Immunity**

5           Defendants argue that even if the force used was excessive, they are entitled to

6   qualified immunity. (ECF No. 91 at 61.) Defendants state only that it is Plaintiffs' burden

7   to demonstrate the rights allegedly violated were clearly established. (*Id.*) For the

8   purposes of summary judgment, the Court view the facts in the light most favorable to

9   Plaintiffs and therefore considers whether the Officers would be entitled to qualified

10  immunity had Mr. Brizuela not pointed his gun at the Officers and had he stood with his

11  back to the Officers when they opened fire. Although the Court agrees that Plaintiffs have

12  not pointed to controlling precedent that "'squarely governs' the specific facts at issue,"

13  *Kisela v. Hughes*, 138 S.Ct. 1148, 1153 (2018) (per curiam) (quoting *Mullenix v. Luna*,

14  577 U.S. 7, 13 (2015) (per curiam)), summary judgment on the qualified immunity

15  question is inappropriate here.

16          In sum, the Court agrees with Plaintiffs that using deadly force on an individual

17  who had not threatened anyone with a gun and was facing away from the police officers

18  when they shot him would be an "obvious case" of unreasonable and excessive force.

19  *Rivas-Villegas v. Cortesluna*, 142 S.Ct. 4, 8 (2021); *see also Brosseau v. Haugen*, 543

20  U.S. 194, 199 (2004) (noting that the standards articulated in *Graham* and *Garner* may

21  "clearly establish" whether force was reasonable or unreasonable under certain

22  circumstances). The constitutional restrictions on the use of deadly force have been

23  repeated by the Supreme Court for more than 35 years. *See Tennessee v. Garner*, 471

24  U.S. 1, 11 (1985) (emphasizing that "[t]he use of deadly force to prevent the escape of all

25  felony suspects, whatever the circumstances, is constitutionally unreasonable" and

26  "[w]here the suspect poses no immediate threat to the officer and no threat to others, the

27  harm resulting from failing to apprehend him does not justify the use of deadly force to do

28  so"). The Ninth Circuit has put an even finer point on the matter, holding that "the mere

45

1   fact that a suspect possesses a weapon does not justify deadly force." *Hayes*, 736 F.3d
2   at 1233; *see also Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) ("An officer's use of
3   deadly force is reasonable only if 'the officer has probable cause to believe that the
4   suspect poses a significant threat of death or serious physical injury to the officer or
5   others.'" (quoting *Garner*, 471 U.S. at 3)).

6          Considering the facts in the light most favorable to Plaintiffs, this would be an
7   obvious case where the use of deadly force would be unreasonable. Viewed under the
8   Fourth Amendment's reasonableness standard, the Officers' use of deadly force would
9   not be justified unless there was probable cause to believe that Mr. Brizuela posed a
10  significant threat of death or serious physical injury to themselves or others. Sullivan
11  testified that he did not feel anyone was in immediate danger, even after Mr. Brizuela
12  picked up his gun. (ECF No. 93-4 at 37.) As further established above, Mr. Brizuela was
13  not fleeing from the Officers and had already been seized within his patio. The Officers
14  further admit they did not consider using non-lethal force, calling for backup, or retreating
15  for better cover. If Mr. Brizuela was standing in his home, with his back to the Officers,
16  and never threatened them with his gun, the use of deadly force would be objectively—
17  and obviously—unreasonable based on established law.

18         The obviousness of this result is clear when compared to cases in which the
19  Supreme Court has found the use of deadly force was justifiable. Every case has involved
20  an express threat of death or serious bodily harm to others, and some have also involved
21  a suspect fleeing arrest. *See Kisela*, 138 S.Ct. at 1151 (involving a woman who
22  approached a bystander with a large knife and officers who stated they subjectively
23  believed the bystander was in serious danger); *Sheehan II*, 575 U.S. at 604-05 (involving
24  a woman who told officers "I'm going to kill you" while wielding a knife and officers who
25  first attempted to use pepper spray, then shot the woman after she continued to
26  approach); *Brosseau*, 543 U.S. at 196 (involving a suspect who was speeding away in a
27  Jeep after being ordered to halt and an officer's belief that the suspect's driving would
28  endanger other officers on foot in the area). Here, Mr. Brizuela was contained in his patio

1    and the Officers did not state that they believed they, or anyone else, was in immediate

2    danger. Unlike in *Kisela*, the Officers did not need to intervene to prevent Mr. Brizuela

3    from harming a bystander. Unlike in *Sheehan II*, Mr. Brizuela had not declared he

4    intended to harm the Officers, nor had he threatened them in any way. Unlike in *Brosseau*,

5    Mr. Brizuela's behavior did not involve a chase or the risk that someone may be

6    accidentally injured. Considered against the established Supreme Court precedent, the

7    Court finds that the facts, when viewed in the light most favorable to Plaintiffs, portray an

8    obvious case of unreasonable and excessive force.

9            These facts remain in dispute, and it is possible the factfinder will determine that

10    Mr. Brizuela did threaten the Officers, that their decision to shoot him was justified, and

11    that would compel this Court to find that qualified immunity attaches. But given the record

12    before the Court, that determination is premature at the summary judgment phase.

13    Accordingly, Defendants are not entitled to summary judgment on their qualified immunity

14    defense, and the Court will deny their motion as to Claim 2.

15                    **2.      Fourteenth Amendment: Substantive Due Process (Claim 3)**

16            Defendants argue Plaintiffs' substantive due process claim fails as a matter of law

17    because each alleged rights violation falls within a different amendment. (ECF No. 91 at

18    34-36.) "Where a particular Amendment provides an explicit textual source of

19    constitutional protection against a particular sort of government behavior, that

20    Amendment, not the more generalized notion of substantive due process, must be the

21    guide for analyzing these claims." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842

22    (1998). In the FAC, Plaintiffs identify the following violations under their substantive due

23    process claim: (1) the Officers used unjustified, and deadly, force; (2) the Officers

24    deprived Mr. Brizuela of his right to bear arms; (3) the Officers deprived Mr. Brizuela of

25    his right to be secure in his person against unreasonable searches and seizures; and (4)

26    the City failed to train, investigate, and discipline their officers. (ECF No. 80 at 14.) Each

27    of these arguments falls within one of the other constitutional claims Plaintiffs raised,

28    specifically claims 1, 2, 5, 11, and 12. In their opposition, Plaintiffs assert that the

1  substantive due process claim is alleged by Mr. Brizuela's children (ECF No. 102 at 53);

2  however, in the FAC, Plaintiffs state the claim is asserted by Mrs. Brizuela in her capacity

3  as administrator of Mr. Brizuela's estate (ECF No. 80 at 13). Accordingly, the substantive

4  due process claim is duplicative of Plaintiffs' other claims and is therefore not cognizable.

5  The Court will grant Defendants summary judgment as to Claim 3.

6         **3.**    **Fourteenth Amendment: Deprivation of Familial Relations**

7                  **(Claim 4)**

8        Plaintiffs assert a claim for deprivation of familial relations and the right of

9  association with Mr. Brizuela in their individual capacities as his surviving family

10  members. (ECF No. 80 at 14-16.) Defendants argue that when there is no underlying

11  constitutional violation, summary judgment for the government is appropriate for a

12  deprivation of familial relations claim. (ECF No. 91 at 38.) As explained below, not only

13  has the Court found there was a constitutional violation, but whether Defendants' conduct

14  shocks the conscience involves disputed material facts that must be resolved by the

15  factfinder. Moreover, Defendants have failed to show they are entitled to their qualified

16  immunity defense. Accordingly, the Court will deny Defendants' motion on this claim.

17                  **a.**    **Legal Standard**

18        Freedom of familial association is protected by the First and Fourteenth

19  Amendments of the Constitution. *See Erotic Serv. Provider Legal Educ. and Research*

20  *Project v. Gascon*, 880 F.3d 450, 458 (9th Cir. 2018). "[C]hoices to enter into and maintain

21  certain human relationships must be secured against undue intrusion by the State

22  because of the role of such relationships in safeguarding the individual freedom that is

23  central to our constitutional scheme." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18

24  (1984); *see also Rueda Vidal v. U.S. Dep't of Homeland Security*, 536 F. Supp. 3d 604,

25  624 (C.D. Cal. 2021) ("Although the Court cautioned that appropriate limits on substantive

26  due process are necessary, it found that 'bonds uniting the members of the nuclear

27  family,' as well as extended family, are 'deeply rooted in this Nation's history and

28  tradition.'" (quoting *Moore v. City of E. Cleveland*, 431 U.S. 494, 502-04 (1977)). The

1   relationship between a parent and a child and the relationship between spouses have
2   both been expressly recognized by the Supreme Court as constitutionally protected. *See*
3   *Board of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545-46 (1987);
4   *see also Hayes v. Cnty. of San Diego*, 736 F.3d 1229-30 (9th Cir. 2013) (recognizing that
5   a child has a constitutionally protected liberty interest under the Fourteenth Amendment
6   in the 'companionship and society' of [their] father").

7       Whether brought under the First or Fourteenth Amendment, courts require
8   plaintiffs asserting a § 1983 claim for deprivation of familial relations to "prove that the
9   officers' use of force 'shock[ed] the conscience.'" *Gonzalez v. City of Anaheim*, 747 F.3d
10  789, 797 (9th Cir. 2014) (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)).
11  If "actual deliberation" by the officer was practical, then the officers' deliberate indifference
12  to the use of excessive force may shock the conscience. *See Hayes*, 736 F.3d at 1230.
13  "On the other hand, where a law enforcement officer makes a snap judgment because of
14  an escalating situation, [their] conduct may be found to shock the conscience only if [they]
15  act[] with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.*

16                          **b.    Analysis**

17      Defendants argue they are entitled to summary judgment because there was no
18  time for the Officers to actually deliberate and they did not act with a purpose to harm that
19  was unrelated to legitimate law enforcement objectives. (ECF No. 91 at 38-39.) But
20  viewed in the light most favorable to Plaintiffs, the factfinder could reasonably find the
21  Officers did have the opportunity to actually deliberate about the appropriate level of force.
22  Admittedly, if the inquiry is limited to the time between when Mr. Brizuela picked up his
23  gun and when the Officers fired—a timeframe of just over 30 seconds—the Officers would
24  have had little to no chance to consider whether the use of deadly force was necessary
25  or appropriate. But when viewed holistically, it is clear the Officers had ample time to
26  deliberate and form a more appropriate approach plan. More than 18 minutes transpired
27  between Sullivan's first meeting with Guadron-Castillo and the moment the Officers
28  began firing on Mr. Brizuela. (ECF No. 91 at 1:25-19:28.) During that time, Sullivan spoke

1   with several neighbors and encountered Mr. Brizuela multiple times. Sullivan learned from

2   Guadron-Castillo of a prior incident in which Mr. Brizuela had a gun and was engaging

3   with law enforcement (ECF No. 102-5 at 5); learned from Aguilar that Mrs. Brizuela had

4   informed him Mr. Brizuela had been hearing voices, talking to himself, and had thoughts

5   about killing people (*id.* at 14-15); and learned from N.A. that Mrs. Brizuela had told him

6   to run away after Mr. Brizuela took N.A.'s skateboard because Mr. Brizuela had

7   "weapons" and might "do something" to N.A. (*id.* at 16). Unlike in *Hayes*, where the

8   officers purportedly had no reason to expect that the suspect would have a weapon,

9   Sullivan heard from multiple witnesses that Mr. Brizuela had had an armed encounter

10  with law enforcement and that Mrs. Brizuela had told N.A. Mr. Brizuela still had a gun.

11  *See* 736 F.3d at 1230 (noting the police officer's "snap judgment" was based on the

12  "unexpected" appearance of a knife). Taken collectively, a reasonable juror could

13  conclude Sullivan's investigation gave him sufficient information to know Mr. Brizuela may

14  have a firearm and may be mentally ill, and, accordingly, that the Officers' plan to detain

15  him could become violent.

16         But moreover, the Officers actually did have the opportunity to discuss the situation

17  and form a plan before approaching the Brizuela Residence. After a cursory and

18  incomplete recitation of what had happened before Maile arrived on the scene, the

19  Officers took only seconds to form their approach plan, despite being several houses

20  away under no immediate threat. (*Id.* at 21.) Sullivan told Maile they were going to "95"

21  Mr. Brizuela "really fast until we can figure everything else out," indicating the Officers

22  knew detention may be a necessary safety precaution. (*Id.* at 21.) Despite this apparent

23  recognition of risk, the Officers did not discuss a change to their strategy when Maile

24  noted that Mr. Brizuela had not been in front of his home when Maile walked over, nor

25  when the Officers observed Mr. Brizuela was no longer in front of his home as they

26  approached. (*Id.*) *Cf. Hayes*, 736 F.3d at 1230 (noting that the option to request more

27  information about the suspect or requesting a psychiatric response team "expired" when

28  the responding officers entered the home). When they ran the plates on the car Mr.

1   Brizuela had been leaning on, they learned which house the car was registered to, but

2   did not ask dispatch for any further information about the residents, despite being the only

3   people on the street with no obvious pressures on their time or attention. (*Id.* at 22.) When

4   the Officers approached the Brizuela Residence, Mr. Brizuela was already within his

5   patio, telling the Officers to turn around and leave. (*Id.*) Even setting aside the Fourth

6   Amendment violations, it was clear from the moment the Officers approached the home

7   that Mr. Brizuela was uncooperative and, as a practical matter, could not immediately be

8   placed in handcuffs. (*Id.*) Nevertheless, the Officers proceeded to approach the patio

9   without further discussion.

10      The circumstances here suggest that the Officers had unrestricted, unpressured

11  time away from any threatening situation during which to form their plan to detain or arrest

12  Mr. Brizuela. Despite having that time, the Officers never paused to reevaluate their plan.

13  Even after Mr. Brizuela continued to avoid answering their questions and repeated that

14  the Officers were breaking the law by remaining on his porch, the Officers did not

15  reconsider their approach. Restricting the scope of the interaction to the moment Mr.

16  Brizuela picked up his firearm and what transpired after would require the Court to ignore

17  significant pieces of information the Officers learned and apparently disregarded. Unlike

18  in *Hayes* or *Gonzalez* where police officers had to respond with minimal information to a

19  situation or where the suspect drew a weapon the officers had no reason to know existed,

20  the Officers here had ample time to consider, reflect, and anticipate what could happen

21  before they approached Mr. Brizuela. Accordingly, the facts do not support a finding that

22  there was no opportunity for the Officers to actually deliberate about the anticipated use

23  of force and potential alternatives or possibilities for de-escalation. Because that failure

24  to actually deliberate could suffice to shock a reasonable juror's conscience, the Court

25  declines to reach the purpose-to-harm argument.

26                          **c.    Qualified Immunity**

27      Defendants give one sentence to their qualified immunity argument on Claim 4 in

28  their summary judgment motion: "[T]he Defendants are entitled to qualified immunity on

1   the claims for Violation of the Fourteenth Amendment (Substantive Due Process) and

2   Violation of the First Amendment (Familial Relations/Right of Association), given that the

3   Defendants are entitled to qualified immunity on the underlying constitutional violations."

4   (ECF No. 91 at 62.) As explained above, the Court has already found Defendants are not

5   entitled to qualified immunity on the unreasonable search and seizure or excessive force

6   claims. Because Defendants have failed to show they are entitled to qualified immunity

7   for Plaintiffs' deprivation of familial relations claim, the Court will deny Defendants'

8   summary judgment as to Claim 4.

9             **4.    Second Amendment: Interference with Right to Bear Arms**

10            **(Claim 5)**

11          Defendants next argue they are entitled to summary judgment on Claim 5 because

12  based on the undisputed facts, Mr. Brizuela's Second Amendment rights were not

13  violated. (ECF No. 91 at 39-40.) In the FAC, Plaintiffs allege that Mr. Brizuela legally

14  owned and possessed his pistol, the possession of the pistol did not constitute a threat of

15  death or serious physical injury to any person, and that the Officers' order to Mr. Brizuela

16  to drop his pistol was unconstitutionally given. (ECF No. 80 at 16-17.) Defendants argue

17  in their summary judgment motion that Mr. Brizuela was resisting law enforcement with a

18  firearm, in violation of Nevada law, and therefore his conduct is not constitutionally

19  protected by the Second Amendment. (ECF No. 91 at 39-40.) Plaintiffs respond that Mr.

20  Brizuela did nothing unlawful by merely possessing a firearm in the presence of police.

21  (ECF No. 102 at 54-55.)

22          Multiple material factual disputes preclude summary judgment on Plaintiffs'

23  Second Amendment claim. First, the parties dispute whether Mr. Brizuela raised his pistol

24  at the Officers or merely held it while in his home. Because the Second Amendment

25  protects an individual right to possess and use firearms only for a "lawful purpose," it

26  would not protect Mr. Brizuela's right to use his pistol in an unlawful manner. *District of*

27  *Columbia v. Heller*, 544 U.S. 570, 620 (2008); *McDonald v. City of Chicago*, 561 U.S.

28  742, 767-78 (2010). Consequently, whether Mr. Brizuela pointed the pistol at the Officers

1
2

may determine whether holding his pistol was lawful or unlawful, and subsequently protected or unprotected use.

3
4
5
6
7
8
9
10
11
12
13
14

Second, Defendants claim that Mr. Brizuela's conduct constitutes resisting law enforcement with a firearm, which would make his conduct per se unlawful.[12] (ECF No. 91 at 40.) Under Nevada law, "[a] person who, in any case or under any circumstances not otherwise specially provided for, willfully resists, delays or obstructs a public officer in discharging or attempting to discharge any legal duty of his or her office shall be punished." NRS § 199.280. This violation is a felony "[w]here a firearm is used in the course of such resistance." *Id.* at § 199.280(1). But Plaintiffs dispute whether the Officers' presence on Mr. Brizuela's porch and subsequent orders constitute an attempt to discharge a "legal duty." *See* NRS § 199.280. As explained above, the Court finds that the Officers' presence on the porch violated Mr. Brizuela's Fourth Amendment rights. Plaintiffs argue accordingly that the Officers' conduct was not in furtherance of discharging a "legal duty" because their conduct was itself unlawful.

15
16
17
18
19
20
21
22
23
24

The Court finds that the lawfulness of a police officer's conduct is an essential element of NRS § 199.280. In the only case that required the Court to consider whether the legality of an officer's conduct is a prerequisite to liability, the Court analogized to California Penal Code § 148(a)(1). *See Carlsson v. Craig*, Case No. 3:14-cv-00091-MMD-VPC, 2016 WL 2954016, at *4 n.3 (D. Nev. Apr. 8. 2018) (report and recommendation noting that California courts have determined § 148(a)(1) makes "the lawfulness of the officer's conduct . . . an essential element of the offense" and concluding that "given the provision's language with regard to the officer's 'legal duty,' the court is persuaded that § 199.280 encompasses a similar requirement"); *see also Velazquez v. City of Long Beach*, 793 F.3d 1010, 1018 (9th Cir. 2015) ("Notably, for a § 148(a)(1) conviction to be valid, a

25

26
27
28

---

[12]Defendants raise new arguments in their reply, including that Mr. Brizuela's brandishing of his firearm would also constitute intimidation of a public officer and assault on an officer in violation of NRS §§ 199.471, 200.471, respectively. (ECF No. 107 at 14.) The Court declines to consider these arguments, as Plaintiffs had no opportunity to respond. However, the Court notes that each alleged offense requires a finding that Mr. Brizuela did raise his weapon at the Officers, a fact which remains in dispute.

1   criminal defendant must have resisted, delayed, or obstructed a police officer in the *lawful*

2   exercise of his duties.") (cleaned up, emphasis in original). The Court finds that the

3   lawfulness of an officer's conduct is a condition precedent to the criminalization of

4   resisting an officer, both as a matter of common sense and from the plain meaning of the

5   statutory text. Because the Officers' continued presence at the Brizuela Residence was

6   unlawful, Mr. Brizuela's conduct does meet the elements of "resisting arrest" under NRS

7   § 199.280. Accordingly, the Court declines to find that Mr. Brizuela's conduct was per se

8   unlawful. Because material facts remain in dispute, Defendants have failed to show that

9   Mr. Brizuela used his pistol for unlawful purposes that fall outside the protection of the

10  Second Amendment.

11          Finally, Defendants assert they are entitled to qualified immunity on the Second

12  Amendment claim because there is no clearly established precedent protecting the right

13  to possess a particular firearm at a particular time. The Court disagrees. Supreme Court

14  precedent clearly establishes that an individual has a right to a firearm for purposes of

15  self-defense, especially within their home for the purpose of defending their home against

16  unlawful intruders. *See Heller*, 554 U.S. at 628 (recognizing that the home is "where the

17  need for defense of self, family, and property is most acute"); *McDonald*, 651 U.S. at 749-

18  50 ("[T]he Second Amendment protects the right to keep and bear arms for the purpose

19  of self-defense."). The *Heller* Court recognized that the individual right to bear arms may

20  be limited in "sensitive places" and that certain classes of people may be prohibited from

21  possessing or obtaining firearms. 554 U.S. at 626. But, viewed in the light most favorable

22  to Mr. Brizuela, the facts show that Mr. Brizuela held his gun in his home while the Officers

23  unreasonably detained him without a warrant and refused to leave and continued to

24  question him without the authority to do so. Under this standard and in this light, Mr.

25  Brizuela's conduct fell squarely within the core of the Second Amendment protection. The

26  Officers have not demonstrated they are entitled to qualified immunity for Claim 5.

27          For these reasons, the Court will deny Defendants summary judgment on Claim 5.

28

54

1

### 5.  False Arrest and False Imprisonment (Claim 6)

Defendants argue that because there was probable cause to arrest Mr. Brizuela and reasonable suspicion to detain him, there can be no liability for false arrest or imprisonment under state law. (ECF No. 91 at 41.) "False imprisonment is an unlawful violation of the personal liberty of another, and consists in confinement or detention without sufficient legal authority." NRS § 200.460(1). To establish a claim for false imprisonment under Nevada law, the plaintiff must establish "that the person be restrained of his liberty under the probable imminence of force without any legal cause or justification." *Hernandez v. City of Reno*, 634 P.3d 668. 671 (Nev. 1981) (citation omitted). A defendant is liable for false imprisonment "if (a) he acts intending to confine the other or a third person within boundaries fixed by the actor, and (b) his act directly or indirectly results in such a confinement of the other, and (c) the other is conscious of the confinement or is harmed by it." *Id.* (quoting Restatement (Second) of Torts § 35 (1965)).

False imprisonment claims against police officers often fail when the officer shows that probable cause supported a warrantless arrest. *See, e.g.*, *Hansen v. Schaefer*, Case No. 2:19-cv-02234-APG-BNW, 2022 WL 891449, at *2 (D. Nev. Mar. 24, 2022) ("An arrest supported by probable cause amounts to detention under a valid legal process, and it cannot give rise to a claim for false imprisonment." (citing *Hernandez*, 634 P.2d at 671)). But as explained above, exigent or emergent circumstances are required for a warrantless probable-cause arrest that takes place within a home to be lawful. Because the confinement did not satisfy all the requirements for valid legal process, the existence of probable cause is insufficient to defeat Plaintiffs' false imprisonment claim.

Defendants further argue the Officers had not detained Mr. Brizuela until the shooting occurred because until that time, the conversation was voluntary. (ECF No. 91 at 41.) But as explained above, the encounter was neither voluntary nor consensual. Moreover, when viewed in the light most favorable to Plaintiffs, a reasonable juror could find that the Officers' presence on the porch constituted "probable imminence of force" if

1  he did not remain on the patio. Accordingly, the Court denies Defendants summary

2  judgment on Claim 6.

3                            **6.    Battery (Claim 7)**

4         Defendants' only argument that the Officers cannot be liable for battery is that the

5  use of force was objectively reasonable. (ECF No. 91 at 42.) "Under Nevada law, police

6  officers 'are privileged to use that amount of force which reasonably appears necessary,'

7  and are liable only to the extent they use more force than reasonably necessary."

8  *Tuuamalemalo v. Greene*, 946 F.3d 471, 478 (9th Cir. 2019) (quoting *Ramirez v. City of*

9  *Reno*, 925 F. Supp. 681, 691 (D. Nev. 1996)). "The standard for common-law assault and

10 battery by a police officer thus mirrors the federal civil rights law standard: Liability

11 attaches at the point at which the level of force used by a peace officer exceeds that which

12 is objectively reasonable under the circumstances." *Ramirez*, 925 F. Supp. at 691. But

13 there remains a genuine dispute of material fact as to whether the level of force the

14 Officers used was necessary under the circumstances. For the same reasons that

15 Defendants are not entitled to summary judgment on Plaintiffs' excessive force claim

16 (Claim 2), the Court likewise denies summary judgment on the battery claim.

17                            **7.    Negligence (Claim 8)**

18        Defendants argue they cannot be liable for negligence because they owed no duty

19 of care to Mr. Brizuela individually. (ECF No. 91 at 43.) Under Nevada law, "the duty of

20 fire and police departments 'is one owed to the public, but not to individuals.'" *Coty v.*

21 *Washoe Cnty.*, 839 P.2d 97, 98-99 (Nev. 1992) (citation omitted). This rule is known as

22 the "public duty doctrine," and applies to public officers as well as the departments that

23 employ them. *See id.* "[T]he public duty doctrine shields public entities, like fire

24 departments or public ambulance services, from liability on the basis that such entities

25 should not be inhibited by their good faith efforts to serve the public, even when the

26 outcome of their emergency treatment is less than desirable." *Porchia v. City of Las*

27 *Vegas*, 504 P.3d 515, 518 (Nev. 2022). The rule is codified at NRS § 41.0336 and

28 includes two exceptions:

1

2

3

4

5

6

> A fire department or law enforcement agency is not liable for the negligent acts or omissions of its firefighters or officers or any other persons called to assist it, nor are the individual officers, employees or volunteers thereof, unless:
> 1. The firefighter, officer or other person made a specific promise or representation to a natural person who relied upon the promise or representation to the person's detriment; or
>
> 2. The conduct of the firefighter, officer or other person affirmatively caused the harm.

7   An officer affirmatively causes harm within the meaning of NRS § 41.0336(2) when they

8   "actively create a situation which leads directly to the damaging result." *Coty*, 839 P.2d at

9   99.

10          The Nevada Supreme Court has only twice addressed the second exception to the

11   public duty doctrine. The first case, *Coty v. Washoe County*, involved a police officer who

12   pulled over an intoxicated driver but left before the transportation arrived. *See* 839 P.2d

13   at 98. The Nevada Supreme Court found the officer was not liable for wrongful death after

14   the driver resumed driving and killed himself and another person in a collision, reasoning

15   the police officer had not affirmatively caused the harm because he had instructed the

16   driver to wait for transportation and the driver ignored that directive. *Id.* The second case,

17   *Porchia v. City of Las Vegas*, involved a negligence action against paramedics who

18   misdiagnosed a man with gas pain when he ultimately required emergency surgery to

19   remove a bowel obstruction. *See* 504 P.3d at 517-18. The first set of paramedics had

20   placed the plaintiff on a stretcher and questioned him about his condition, but decided not

21   to transport him to the hospital when they learned he was homeless. *Id.* at 517. The

22   Nevada Supreme Court reasoned that although misdiagnoses are usually omissions

23   rather than affirmative actions, here, the plaintiff had reasonably alleged that the

24   paramedics' decision not to transport him to the hospital was an affirmative action that

25   prevented him from receiving necessary medical care. *Id.* at 251.

26          When viewed in a light most favorable to Plaintiffs, the facts here more closely

27   resemble *Porchia*. The Officers approached Mr. Brizuela, remained on his porch after he

28   asked them to leave, and continued to question him as he became increasingly agitated.

1   The Officers' actions at minimum contributed to escalating the situation and could

2   reasonably be found to have caused Mr. Brizuela to pick up his weapon. Accordingly, the

3   Court will deny summary judgment on the negligence claim because Defendants have

4   not shown they are entitled to the public duty doctrine defense.

### 8.   Wrongful Death (Claim 10)

6        Defendants' argument that they are entitled to summary judgment on Plaintiffs'

7   wrongful death claim mirrors the arguments made on the excessive force, battery, and

8   negligence claims (Claims 2, 7, 8), and for the same reasons are unpersuasive. (ECF No.

9   91 at 55.) Nevada law permits a claim for damages "[w]hen the death of any person . . .

10  is caused by the wrongful act or neglect of another." NRS § 41.085(2). Essentially,

11  Defendants argue they were justified in shooting Mr. Brizuela and therefore his death was

12  "not wrongful." (ECF No. 91 at 55.) But because factual disputes preclude a finding that

13  the Officers used reasonable force or were otherwise justified in shooting Mr. Brizuela

14  eleven times in the back, whether the Officers' action was "wrongful" remains disputed.

15  The Court therefore denies Defendants summary judgment on the wrongful death claim.

### 9.   ADA Title II: Disability Discrimination (Claim 9)

17       Plaintiffs allege that the City failed to reasonably accommodate Mr. Brizuela's

18  disability in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131,

19  *et seq.* ("ADA"), and § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). (ECF No. 80 at

20  21-23.) Specifically, Plaintiffs allege Mr. Brizuela was a qualified individual with a disability

21  and that the City was aware of Mr. Brizuela's disability, but failed to communicate this

22  information to Sullivan via dispatch. (*Id.*) Plaintiffs further contend that the Officers either

23  knew or should have known that Mr. Brizuela suffered from a mental or psychological

24  disability, yet failed to reasonably accommodate his disability. (*Id.*)

25       "To prove that a public program or service violated Title II of the ADA, a plaintiff

26  must show: (1) he is a 'qualified individual with a disability'; (2) he was either excluded

27  from participation in or denied the benefits of a public entity's services, programs, or

28  activities, or was otherwise discriminated against by the public entity; and (3) such

exclusion, denial of benefits, or discrimination was by reason of his disability." *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *as amended on denial of reh'g on banc* (Oct. 11, 2001). A "disability" under the ADA is either "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Any one of these three prongs may establish a disability under the ADA. *See* 28 C.F.R. § 35.108(a)(2)(ii). A "physical or mental impairment" means "[a]ny mental or psychological disorder such as intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disability." *Id.* at § 35.108(b)(1)(ii). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A); *see also* 28 C.F.R. § 35.108(c)(1)(i) (enumerating "interacting with others" as an additional major life activity).

When analyzing whether an individual has a disability under the ADA, courts must construe statutory and regulatory definitions broadly. [cite] Indeed, the regulations expressly state that the definitions of "disability" and "substantially limits" must be "construed broadly in favor of expansive coverage." *Id.* at §§ 35.108(a)(2)(i), (d)(1)(i). Moreover, the term "major" in major life activity "shall not be interpreted strictly to create a demanding standard," nor must a major life activity be "of *central* importance to daily life." *Id.* at § 35.108(c)(2) (emphasis in original). Ultimately, the regulation prescribes that:

> Whether an individual has a record of an impairment that substantially limited a major life activity shall be construed broadly to the maximum extent permitted by the ADA and should not demand extensive analysis. An individual will be considered to fall within this prong of the definition of 'disability' if the individual has a history of an impairment that substantially limited one or more major life activities when compared to most people in the general population.

*Id.* at § 35.108(e)(2). Several mental and emotional disorders—including major depressive disorder, bipolar disorder, and schizophrenia—are enumerated in the Title II

1  regulation as disabilities that "at a minimum" substantially limit brain function. *See id.* at §

2  35.108(d)(2)(iii)(K).

3      Defendants assert that the ADA claim fails as a matter of law because (1) Mr.

4  Brizuela was not a qualified individual with a disability and (2) Plaintiffs failed to show that

5  Mr. Brizuela was discriminated against because of a disability.[13] (ECF No. 91 at 44-52.)

6  Defendants further argue that even if Plaintiffs can show that Mr. Brizuela did have a

7  qualifying disability and was discriminated against because of that disability, monetary

8  damages are not available because Plaintiffs have failed to show the City acted with

9  deliberate indifference. (*Id.* at 52-55.) The Court addresses each argument in turn.

10                    **a.    Qualifying Disability**

11      Defendants argue that Mr. Brizuela did not have a disability for the purposes of

12  Title II because (1) he was never diagnosed with a mental disability and (2) his mental

13  state did not substantially limit any "major life activities." (ECF No. 91 at 44.) As to their

14  first argument, Defendants are misguided: nothing in Title II of the ADA requires that a

15  person be formally diagnosed with a mental health disorder before finding the person has

16  a mental impairment. *See* 28 C.F.R. § 35.108(e)(1) (explaining an individual has a "record

17  of" an impairment when there is "a history of" the impairment, including when the

18  individual "has been misclassified as having" the impairment); *see also id.* at §

19  35.108(e)(2) (requiring that what constitutes a "record of" an impairment be "construed

20  broadly to the maximum extent permitted by the ADA"). Here, the Legal 2000 and the

21  Renown hospital records show Mr. Brizuela did have a record of psychosis. (ECF No. 93-

22  25, 102-14 at 7-10.) The Court therefore turns to Defendants' second argument—whether

23  Mr. Brizuela's impairment substantially limited any of his major life activities.

24      Defendants predominantly rely on admissions and deposition testimony from Mrs.

25  Brizuela. For example, Mrs. Brizuela states that a doctor never told her that Mr. Brizuela

26  ───────────────

27      [13]Defendants first argue that the ADA claim may only be asserted against the City, not the Officers, because there is no individual liability for alleged violations of Title II of the ADA or § 504 of the Rehabilitation Act. (ECF No. 91 at 43.) This argument is moot, as the claim is asserted only against the City, not against the Officers. (ECF Nos. 80 at 21, 102 at 57.)

28

1    was mentally ill, though she believed he was. (ECF No. 93-24 at 4.) She further states

2    that although she and her son, Roland, tried to talk to a doctor about Mr. Brizuela's mental

3    health, "but they declined." (*Id.* at 16.) Mrs. Brizuela denies that Mr. Brizuela was never

4    diagnosed with a mental illness, as he was admitted to West Hills Behavior Health

5    Hospital following his visit to Renown due to "psychosis." (*Id.* at 4.) In her deposition, Mrs.

6    Brizuela stated that Mr. Brizuela was never prescribed any medication for mental illness.

7    (ECF No. 93-17 at 8.) She further testified that Mr. Brizuela was able to take care of

8    himself and "could get by on his own," and that Mr. Brizuela could perform manual tasks

9    and had no issues with bodily functions such as seeing, hearing, eating, sleeping,

10   walking, standing, or lifting. (*Id.* at 25.) In her deposition, Mrs. Brizuela repeatedly stated

11   that she could not answer whether Mr. Brizuela's mental condition inhibited his

12   concentration, communication, or through processes, as she was "not in his mind." (*Id.* at

13   26-27.)

14        As Mrs. Brizuela testified at her deposition, the extent to which Mr. Brizuela's

15   mental condition impeded his ability to think, communicate, and interact with others—all

16   major life activities under the ADA—is undeterminable because he is not alive to testify

17   about his interior mental state. *Cf. Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th

18   Cir. 2014) (requiring exacting scrutiny from courts at summary judgment when the witness

19   able to testify to material facts has been killed by the defendants). The Court is satisfied,

20   after reviewing the record, that the 2017 incident resulting in the Legal 2000 hold, hospital

21   notes indicating he was experiencing psychosis, and ultimate transfer to the West Hills

22   Behavior Health Hospital establish a record of a mental impairment that would

23   substantially interfere with his major life activities when compared to the experiences of

24   the general population. Accordingly, the Court finds that Mr. Brizuela did have a disability

25   as defined by Title II of the ADA.

26                 **b.    Discrimination Because of Disability**

27        Defendants argue alternatively that even if Mr. Brizuela did have a disability, the

28   ADA claim fails because the City did not discriminate against him based on that disability.

1    (ECF No. 91 at 46.) Defendants' argument contains two prongs: (1) the City did not know

2    that Mr. Brizuela had a mental illness and therefore could not have known he required

3    accommodation, and (2) the accommodations provided were objectively reasonable. The

4    Court examines each proposition in turn.

5         First, Defendants argue that they had no knowledge of Mr. Brizuela's disability,

6    and that knowledge is a prerequisite to a finding of discrimination. (*Id.* at 47-48.) But here,

7    both the City and Sullivan had some degree of notice that Mr. Brizuela had a disability.

8    Sparks Police Department had—eight months prior—responded to a Legal 2000 request

9    wherein the complainant described Mr. Brizuela talking about seeing monsters in his

10   house while armed. (ECF No. 93-25 at 2.) Defendants' reasoning is untenable. Liability

11   under Title II of the ADA would be nearly impossible if a police department does not have

12   the requisite knowledge that an individual has a mental illness even after that same

13   department responded to an incident expressly predicated on the same individual's

14   suspected mental illness.

15        But setting aside the Legal 2000 hold, the facts of this case indicate the Officers

16   were on notice that Mr. Brizuela may be experiencing mental illness. Based on his

17   investigation and interviews with Mr. Brizuela's neighbors, Sullivan had reason to believe

18   that Mr. Brizuela may have a mental illness and may require accommodation. When

19   Sullivan first encountered Mr. Brizuela, he noted that Mr. Brizuela was behaving

20   somewhat erratically, asking if Sullivan was going to shoot him within seconds of their

21   first meeting. (ECF No. 93-3 at 7:39-8:08.) Later, he spoke with Aguilar, who told Sullivan

22   that Mr. Brizuela's wife had mentioned that Mr. Brizuela had been hearing voices and had

23   suggested that Aguilar be careful around Mr. Brizuela. (*Id.* at 11:00-11:14.) Both Sullivan's

24   personal observations and information relayed to him suggested Mr. Brizuela may have

25   a mental illness. A rational factfinder could therefore find that the Officers learned through

26   their investigation that Mr. Brizuela may have a mental illness that required

27   accommodation. The City therefore had some notice that Mr. Brizuela may have a mental

28   illness; moreover, the City had information that the situation may become dangerous to

1   responding officers or other individuals. Taken together, the Court finds that the factfinder

2   could reasonably conclude the City was aware that Mr. Brizuela had a qualifying disability.

3       Second, Defendants argue that irrespective of the City's knowledge, the provided

4   accommodations were reasonable as a matter of law. (ECF No. 91 at 49-52.) Plaintiffs

5   identified possible reasonable accommodations as including (but not limited to) "engaging

6   in non-threatening communication, respecting [Mr. Brizuela's] comfort zone within his own

7   home, [and] considering his perceptions that the police were wrongfully attempting to

8   enter his home." (ECF No. 80 at 23.) In their opposition to Defendants' summary judgment

9   motion, Plaintiffs further noted that nothing prevented the Officers from leaving Mr.

10  Brizuela's property when they saw that he was agitated. (ECF No. 102 at 57.) Defendants

11  attempt to rebut each of these requests, but as explained below, each of their arguments

12  either turns on a dispute of material fact or relies on faulty reasoning.

13      Courts in this circuit have repeatedly recognized that reasonableness of an

14  accommodation is ordinarily a question of fact left to the jury. *See, e.g.*, *Sheehan I*, 743

15  F.3d at 1233 ("[T]he reasonableness of an accommodation is ordinarily a question of

16  fact[.]"). The facts here support following this recognized approach. First, the parties

17  dispute whether the tone of the Officers' questions was non-threatening, and whether the

18  Officers attempted at any point to de-escalate the situation or in fact contributed to its

19  escalation. Defendants next argue that they did respect Mr. Brizuela's comfort zone by

20  choosing not to "grab" Mr. Brizuela or break into the patio. As explained above, the

21  Officers' presence on the porch violated Mr. Brizuela's Fourth Amendment rights; but

22  more pertinently, the Court finds that declining to break into an enclosed patio does not

23  necessarily equate to respecting the personal space of someone in an agitated state.

24      Finally, Defendants argue that considering Mr. Brizuela's perception that the

25  Officers were unlawfully trying to gain entry to his home is "patently unreasonable" and

26  "would fundamentally alter the nature of the service or activity of the [Sparks Police

27  Department] as law enforcement." (ECF No. 91 at 51.) But under the law of this circuit,

28  police officers should consider whether less intrusive means of force are available,

especially when a suspect is "mentally unstable, acting out, and at times invit[ing] officers to use deadly force." *Vos*, 892 F.3d at 1033-34. It may be the case that there is no blanket requirement for responding officers to retreat from a felony investigation, but that is not the only question before the Court. Instead, when Sullivan was informed Mr. Brizuela hears voices and both Officers observed his erratic behavior (including asking the Officers to shoot him and calling them thieves) a reasonable accommodation could have been giving Mr. Brizuela more physical space and time to calm down, as Plaintiffs suggested, or even "creat[ing] a perimeter, assembl[ing] less-lethal means, coordinat[ing] a plan for their use of force, establish[ing] cover and, arguably, try[ing] to communicate" with Mr. Brizuela. *See id.* at 1034. Because a jury could find that these actions—recognized by the Ninth Circuit as available means to establish rapport and compliance with mentally ill individuals that are less intrusive than deadly force—are reasonable accommodations the Officers could have made, the Court declines to grant Defendants' summary judgment motion as to Claim 9.

### c.    Monetary Damages for Deliberate Indifference

Defendants additionally argue that monetary damages are unavailable for a Title II violation because Plaintiffs have not shown the City was deliberately indifferent to Mr. Brizuela's need for accommodation due to his disability. (ECF No. 91 at 52-55.) "[C]ompensatory damages are not available under Title II . . . absent a showing of discriminatory intent." *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1988), *as amended* (Oct. 8, 1998). "To show intentional discrimination, [the Ninth Circuit] requires that the plaintiff show the defendant acted with 'deliberate indifference,' which requires 'both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that . . . likelihood.'" *Updike v. Multnomah Cnty.*, 870 F.3d 939, 950-51 (9th Cir. 2017) (quoting *Duvall*, 260 F.3d at 1139). A plaintiff satisfies the first element of the deliberate indifference test if they "alerted the public entity to [their] need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation)." *Duvall*, 260 F.3d at 1139. "To meet the second prong, the entity's failure

1   to act 'must be a result of conduct that is more than negligent, and involves an element

2   of deliberateness.'" *Updike*, 870 F.3d at 951 (quoting *Duvall*, 260 F.3d at 1139).

3          Plaintiffs have not argued or shown that Defendants intentionally discriminated

4   against Mr. Brizuela. However, the factfinder could reasonably find Sullivan deliberately

5   ignored witness statements that Mr. Brizuela was hearing voices, talking to himself, and

6   had behaved erratically with a firearm in a prior incident that required police intervention.

7   Sullivan did not follow up with dispatch about the circumstances of the prior incident, nor

8   did he relay the details Aguilar had provided about Mr. Brizuela's mental state to Maile.

9   Although both Officers had ostensibly been trained in recognizing mental illness, a

10  reasonable juror could find that neither took any step to accommodate Mr. Brizuela.

11  Because it is unclear whether the Officers' failure to respond to the information that Mr.

12  Brizuela may be mentally ill was merely negligent or rose to the level of deliberate

13  indifference to his mental state, the Court declines to grant summary judgment on the

14  damages issue.

15          **10.    Municipal Liability (Claims 11 and 12)**

16          Plaintiffs also assert that the City is liable under § 1983 pursuant to the municipal

17  liability doctrine as set forth in *Monell v. Department of Social Services*, 436 U.S. 658

18  (1978). Mrs. Brizuela, as the special administrator of Mr. Brizuela's estate, argues the

19  City is liable (1) for failing to train Officers on the Second, Fourth, and Fourteenth

20  Amendments, (2) for failing to investigate or discipline the Officers after they killed Mr.

21  Brizuela in violation of their policies, and (3) for ratifying the Officers' conduct by failing to

22  investigate, discipline, or retrain the Officers. (ECF No. 80 at 24-29.) Mrs. Brizuela,

23  Roland Brizuela, and Morgan Brizuela assert similar claims in their individual capacity

24  based on their Fourteenth Amendment deprivation of familial relations claim. (*Id.* at 30-

25  31.) Defendants argue Plaintiffs' municipal liability claims cannot survive summary

26  judgment because Plaintiffs have not supplied sufficient evidence to support their claims.

27  (ECF No. 91 at 56-59.)

28  ///

To establish municipal liability under *Monell*, a plaintiff must prove that "(1) [they] were] deprived of a constitutional right; (2) the municipality has a policy; (3) the policy amounted to a deliberate indifference to [the plaintiff's] constitutional right; and (4) the policy was the moving force behind the constitutional violation." *Lockett v. City of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020). "A plaintiff can satisfy *Monell*'s policy requirement in one of three ways." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021). "First, a local government may be held liable when it acts 'pursuant to an expressly adopted official policy.'" *Id.* (quoting *Thomas v. Cnty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014)). "Second, a public entity may be held liable for a 'longstanding practice of custom.'" *Id.* (quoting *Thomas*, 763 F.3d at 1170). "Third, 'a local government may be held liable under Section 1983 when 'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'" *Id.* (quoting *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010), *overruled on other grounds by Castro v. Cnty. of L.A.*, 833 F.3d 1060 (9th Cir. 2016)). "The Supreme Court has made clear that policies can include written policies, unwritten customs and practices, failure to train municipal employees on avoiding certain obvious constitutional violations, and, in rare instances, single constitutional violations are so inconsistent with constitutional rights that even such a single instance indicates at least deliberate indifference of the municipality." *Benavidez v. Cnty. of San Deigo*, 993 F.3d 1134, 1153 (9th Cir. 2021) (internal citations omitted). But "generally, a single instance of unlawful conduct is insufficient to state a claim for municipal liability under § 1983." *Id.* at 1154.

Two of Plaintiffs theories of municipal liability stem from an unconstitutional policy, practice, or custom—that the City failed to appropriately train its officers, and that the City failed to adequately investigate or discipline its officers for constitutional violations. Plaintiffs also argue that the City's response (or lack thereof) in this instance amounts to ratification of their unconstitutional conduct. Because Plaintiffs have supplied sufficient

1  evidence to show there is a genuine dispute of material fact on each of their theories, the

2  Court will deny Defendants' summary judgment motion on the municipal liability claims.

3  **d.    Practice or Custom**

4  Plaintiffs first allege the City failed to train its police officers on their responsibilities

5  under the Second, Fourth, and Fourteenth Amendments. (ECF No. 80 at 25.) Specifically,

6  Plaintiffs allege the City's inadequate training includes:

(i)     Failure to train officers on what constitutes a felony.
(ii)    Failure to train officers on what constitutes a misdemeanor.
(iii)   Failure to train regarding citizens' rights under the Second Amendment of the U.S. Constitution.
(iv)    Failure to train officers on what constitutes exigent circumstances and improper entry into individuals' homes under the Fourth Amendment.
(v)     Failure to train regarding entries into individuals' homes in violation of the Fourth Amendment and what constitutes exigent circumstances.
(vi)    Failure to train officers on how to de-escalate situations involving armed mentally ill individuals;
(vii)   Failure to train officers to provide proper warnings before shooting;
(viii)  Failure to train officers on the "objectively reasonable" standard as applied to law enforcement decisions and use of force;
(ix)    Failure to train officers on the reasonableness of a particular use of force based on perspective of a reasonable officer at the scene rather than with 20/20 vision of hindsight;
(x)     Failure to train officers on what actions are "objectively reasonable" in light of the facts confronting them, without regard to their underlying intent or motivation;
(xi)    Failure to train officers to develop tactical plans before approaching an individual they know to be mentally ill.
(xii)   Failure to train officers on what constitutes the curtilage of a person's property.

20  (*Id.* at 26.)

21  "Failure to train may constitute a basis for *Monell* liability where the failure amounts

22  to deliberate indifference to the rights of those who deal with the municipal employees."

23  *Benavidez*, 993 F.3d at 1153 (citing *City of Canton v. Harris*, 489 U.S. 378, 388-89

24  (1989)). "To allege a failure to train, a plaintiff must include sufficient facts to support a

25  reasonable inference (1) of a constitutional violation; (2) of a municipal training policy that

26  amounts to deliberate indifference to constitutional rights; and (3) that the constitutional

27  injury would not have resulted if the municipality properly trained their employees." *Id.* at

28  1153-54. Importantly, "deliberate" indifference is required—"[m]ere negligence will not

1
2
3
4
5

suffice to show *Monell* liability." *Id.* at 1153-54. A plaintiff must prove that "policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "A municipality's culpability for a deprivation of rights is at is most tenuous where a claim turns on a failure to train." *Id.*

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

Defendants claim they are entitled to summary judgment on the municipal liability claims because the evidence shows "both Officer Sullivan and Maile received substantial training, and a thorough investigation of the incident occurred." (ECF No. 91 at 59.) Both Officers were CIT members and had been trained in the SPD's policies for responding to mentally ill individuals. But despite that training, Sullivan did not alert dispatch that he had responded to a situation that involved someone who may be hearing voices. Nor did Sullivan relay to Maile the neighbors' descriptions of Mr. Brizuela's erratic behavior, that several neighbors suspected he had a gun, or that there had been a prior incident with Mr. Brizuela that required SPD response. Neither Officer requested further information about the inhabitants of the home listed on the registration for the white car that Mr. Brizuela was leaning against, nor did they inquire about the prior incident that several neighbors recounted. Although Defendants have demonstrated the Officers received numerous hours of training on how to respond to individuals with mental illness, the Officers' behavior does not support a definitive conclusion that the training they received was sufficient or effective.

21
22
23
24
25
26
27

Moreover, the Officers' confusion about the legality of their actions, as evidenced by their conflicting responses in deposition testimony, creates a factual dispute about the adequacy and effectiveness of their training. As they approached the Brizuela Residence, Sullivan said that he intended to "95" Mr. Brizuela, by which Sullivan meant the Officers should place him in handcuffs to detain him. Setting aside for the moment that this comment indicates Sullivan believed he could handcuff Mr. Brizuela in his own home without an arrest warrant or exigent circumstances, Maile understood Sullivan's code to

28

1    mean that he actually did intend to arrest Mr. Brizuela. As a result, the Officers had two

2    different intentions as they approached the Brizuela Residence.

3          Similar confusion arose about what constituted the curtilage of the Brizuela

4    Residence and the attendant Fourth Amendment protections, which deeply affected the

5    constitutionality of the Officers' warrantless search and seizure. Although both Officers

6    felt that the walkway and the porch were part of the home's curtilage (ECF Nos. 93-4 at

7    25, 93-8 at 23), Sullivan believed there was a distinction for Fourth Amendment purposes

8    between where he stood on the porch and if he were within the interior of the home (ECF

9    No. 93-4 at 27-28). Moreover, Maile expressed that even if Mr. Brizuela clearly told the

10   Officers to leave his property while demanding that they get a warrant, he could remain

11   on the front porch and continue questioning Mr. Brizuela, despite the fact that no other

12   exception to the warrant requirement applied. (ECF No. 93-8 at 23.)

13         The confusion about what protections are afforded to the curtilage is even more

14   significant because of the Officers' expansive interpretation of "hot pursuit." Because the

15   Officers did not believe Mr. Brizuela posed an immediate threat of harm to others (ECF

16   Nos. 93-4 at 22, 93-8 at 21) and there was not a risk that evidence would be destroyed,

17   their belief that Mr. Brizuela was fleeing and the hot pursuit exception applied was the

18   only basis grounding their belief that they could break into his home without an arrest

19   warrant. Both Officers expressed after the fact that they believed Mr. Brizuela was

20   "fleeing," even though he was within his enclosed patio when they approached, opened

21   the gate only to tell them to leave, and then remained within his patio throughout the

22   interaction. (ECF Nos. 93-4 at 27-28, 93-8 at 21.) The Officers' lack of clarity about the

23   appropriate restraints of their authority combined here to compound the violation and may

24   have contributed to Mr. Brizuela's distress and the ultimate escalation of the incident. For

25   these reasons, the Court concludes there is a genuine dispute of material fact as to

26   whether the Officers' training was sufficient to inform them about the constitutional

27   restraints on their authority to interrogate, detain, or arrest a person within their own home.

28   ///

1    Finally, a rational factfinder could deduce that the Officers' training was inadequate

2    because the Officers did not comply with SPD policy. Although SPD promulgated DM 7.1

3    for CIT-trained police officers to follow when responding to mentally ill individuals, neither

4    Sullivan nor Maile complied with the policy. While the Officers were not dispatched to a

5    known CIT event, the procedure incorporates situations in which an officer "goes to a call

6    and determines that it meets the criteria to dispatch a CIT officer." (ECF No. 102-21 at 3.)

7    Even after hearing reports from his neighbors that Mr. Brizuela had been hearing voices

8    and that SPD had responded to a prior incident, Sullivan either failed to recognize that

9    this was a situation which may require CIT involvement or did recognize that Mr. Brizuela

10   may require CIT presence but failed to notify dispatch of that fact. Had the Officers

11   recognized that Mr. Brizuela had a mental illness, they would have been required to

12   respond with de-escalatory tactics per DM 7.1, including consideration of "less-lethal

13   forms of force" and may have requested a crisis negotiator. (*Id.* at 3.) Those options were

14   not considered here. The existence of protective policies does little for the community if

15   Officers are unable to recognize situations in which they are required. Accordingly, the

16   Court finds that summary judgment is not appropriate on Defendants' failure to train

17   theory.

18   The second prong of Plaintiffs' policy or custom theory of liability states the City

19   failed to properly investigate and discipline the Officers' misconduct, and that failing to do

20   so comported with the City's historical custom and practice of refusing to investigate

21   policy violations or to discipline violators. (ECF No. 80 at 26.) A plaintiff "can also establish

22   liability under a failure to discipline theory by showing 'repeated constitutional violations

23   for which the errant municipal officials were not discharged or reprimanded.'" *Elifritz v.*

24   *Fender*, 460 F. Supp. 3d 1088, 1020 (D. Or. 2020) (quoting *Gillette v. Delmore*, 979 F.2d

25   1342, 1349 (9th Cir. 1992)). Defendants contest that Plaintiffs have supported their failure

26   to investigate or discipline argument with sufficient evidence because they have not

27   shown there is a policy of inaction. (ECF No. 107 at 19.)

28   ///

1      Plaintiffs offer the testimony of former SPD Chief Peter Krall, who remarked he

2   was unaware of any instance under which an SPD officer was disciplined for an officer-

3   involved shooting. (ECF No. 102-31 at 4.) Defendants argue Krall "did not say anything

4   close to admitting a policy of inaction." (ECF No. 107 at 19.) But the standard Defendants

5   demand Plaintiffs meet is far too high. It is difficult to imagine that a police department

6   would readily admit to routinely failing to respond to constitutional violations. It is possible

7   that even if no officer has ever been disciplined for an officer-involved shooting, a jury

8   may find SPD responded appropriately and in conformity with constitutional standards

9   and its own guidelines. But Krall's admission that he cannot recount a single instance an

10   officer was disciplined for an officer-involved shooting, coupled with the fact that there

11   was no internal affairs investigation in violation of SPD policy for the Officers' killing of Mr.

12   Brizuela, creates a genuine dispute of material fact about (1) whether SPD had a custom

13   of failing to investigate officer-involved shootings and failing to discipline officers for

14   constitutional violations—including excessive force, and (2) whether such a custom over

15   several years evidences SPD's deliberate indifference to its officers' unconstitutional

16   conduct.

17      Summary judgment is therefore not appropriate on either of Plaintiffs' policy or

18   custom theories.

19                      e.      Ratification[14]

20      Apart from the City's alleged custom of failing to investigate or discipline its officers,

21   Plaintiffs also allege that in this specific instance, the City ratified the Officers' conduct by

22   failing to investigate or discipline Sullivan and Maile. (ECF No. 102 at 58.) A municipality

23   may be liable under § 1983 if "an official with final policy-making authority . . . ratified a

24   subordinate's unconstitutional decision or action and the basis for it." *Rodriguez v. Cnty.*

25   *of Los Angeles*, 891 F.3d 776, 802-03 (9th Cir. 2018). "To show ratification, a plaintiff

26

27         [14]The Court does not consider Plaintiffs' belated request for partial summary
      judgment on the ratification portion of their municipal liability claims. (ECF No. 102 at 61.)
28   Defendants correctly note that Plaintiffs' request could have been incorporated in their
      partial motion for summary judgment, yet came after the dispositive motions deadline and
      is therefore untimely. (ECF No. 107 at 19.)

must prove that the 'authorized policymakers approved a subordinate's decision and the basis for it.'" *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).

Defendants do not dispute that neither Officer received any discipline or retraining, nor do they dispute that there was no internal affairs investigation, even though such an investigation is mandatory under DM 9.1. (ECF No. 107 at 18.) Instead, Defendants claim that they abided by the conclusions in the DA's Report that the killing was justified under Nevada law. (ECF No. 107 at 19.) But, as Plaintiffs note, the DA's Report did not consider whether there was a violation of Mr. Brizuela's rights to be free from unreasonable search or seizure, nor does it supplant the SPD's obligation to investigate whether the Officers' conduct were in conformity with SPD policy. (ECF No. 102 at 60-61.) As to the lack of investigation, the only argument Defendants put forward is that DM 9.1 does not set forth a timeframe under which an internal affairs investigation must occur. (*Id.*) It has now been over four years since the Officers killed Mr. Brizuela—Maile is no longer even employed by SPD. Considering the passage of time, Defendants' argument that an investigation may be forthcoming is not credible. Moreover, the supposition that such a delayed investigation would be in compliance with DM 9.1 provides no limiting standard that would permit this Court or any other to determine the timeliness of an indisputably required investigation.

Summary judgment is therefore not appropriate on Plaintiffs' ratification theory of municipal liability.

## V.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motions before the Court.

It is therefore ordered that Defendants' motion for partial judgment on the pleadings (ECF No. 82) is denied.

1    It is further ordered that Plaintiffs' motion for partial summary judgment (ECF No.

2    87) is granted. The Court grants judgment for Plaintiffs on the Fourth Amendment

3    unreasonable search and seizure claim (Claim 1) as to liability.

4    It is further ordered that Defendants' motion for summary judgment (ECF No. 91)

5    is granted in part and denied in part. The Court grants judgment for Defendants on the

6    standalone Fourteenth Amendment Substantive Due Process claim (Claim 3). All other

7    remaining claims (Claims 2 and 4-12) will proceed.

8    It is further ordered that Mrs. Brizuela's supplemental declaration (ECF No. 97)

9    filed in support of Plaintiffs' partial motion for summary judgment is stricken because

10   Plaintiffs did not seek leave from the Court before supplementing their brief.

11   DATED THIS 10th Day of August 2022.

12

13   _____

14   MIRANDA M. DU
     CHIEF UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

73